[No. H009495. Sixth Dist. Aug. 11, 1993.]

In re the Marriage of STEVEN C. and JUDY QUAY.
STEVEN C. QUAY, Appellant, v.
JUDY QUAY, Appellant.

[No. H009803. Sixth Dist. Aug. 11, 1993.]

In re the Marriage of STEVEN C. and JUDY QUAY.
STEVEN C. QUAY, Appellant, v.
JUDY QUAY, Respondent.

**COUNSEL**

Trope & Trope and Thomas Paine Dunlap for Appellant Husband.

Bernard N. Wolf, Lakin & Spears, George H. Norton and Sherrol Cassedy for Appellant and Respondent Wife.

## OPINION

**WUNDERLICH, J.**—We consider together two appeals filed by Dr. Steven C. Quay (Steven) in this vigorously litigated marital dissolution case. The first appeal is from a further judgment on certain reserved issues, and Mrs. Judy Quay (Judy) mounts a protective cross-appeal. (H009495.) In the first appeal Steven challenges the trial court's treatment of a covenant not to compete, entered into in connection with the sale of a business. He also challenges the trial court's award to Judy of $100,000 in attorney fees, based on Civil Code section 4370.6. In the second appeal Steven challenges the trial court's postjudgment order assigning to him the whole face value of a $980,000 note, based on a loan he made while the dissolution action was pending and he was managing the community's assets. (H009803.) We take up the appeals one by one, but rely on one statement of the basic facts. In the first case we reverse the ruling on the covenant not to compete. In the second case we affirm the trial court's order assigning the $980,000 note solely to Steven.

### Summary of the First Case

The primary issue on appeal is the treatment of the value of Steven's agreement not to compete as a setoff to the community's profit from the sale of community property stock.

During the marriage Steven founded a company that tested and developed certain pharmaceuticals. The company was sold for $55 million in April of 1989, after the parties had separated. The community received about $7.5 million for the 14 percent of the stock it owned. As a condition of buying the company, the purchaser required a five-year promise not to compete from Steven. While the five-year period began after the parties separated, it was clear the stock would have been worthless unless Steven had given his promise not to compete. With that promise, the community realized the $7.5 million profit.

The trial court ruled that the community should reimburse Steven for the detriment he suffered by his agreement not to compete. The court assigned a value to the detriment Steven suffered because of the covenant not to compete. The trial court then held that the community should bear only 14 percent of Steven's loss, as it only owned 14 percent of the stock of the company. Steven's challenge to that ruling is the major issue on appeal. The second issue is the propriety of the trial court's punitive award of attorney fees to Judy.

### Statement of Facts

Steven and Judy were married for 17 years and have 1 daughter. Steven has a Ph.D. in biological chemistry, as well as an M.D. After a distinguished

career as a student, Steven joined the faculty of the Stanford University Medical School. While there he conceived the idea of forming a company to research and develop the class of drugs known as magnetic resonance imaging (MRI) contrast agents. The MRI process provides resolution of individual organs and allows the diagnosis of disease. Contrast agents enhance the images developed by MRI and make diagnosis easier and more reliable.

Steven incorporated a business called Salutar, Inc. (Salutar) for this purpose in September 1983. At that time MRI technology was in its infancy, with only 30 machines in the world, none of which had Food and Drug Administration approval. There were no MRI contrast agent drugs in existence at that time.

Salutar stock was issued in January of 1984. At first Steven was the only shareholder in the company. However, in order to secure the money needed for research and development, the company went through three venture capital financings over the next few years. In the third financing Steven was required to enter into a stock restriction agreement, by which the company acquired the right to buy back some of his already vested shares. The shares would revest over two years, as long as he remained in the employ of the company.

In 1988 Salutar again needed an infusion of capital to continue testing and development of its most promising contrast agent, S041. Rather than dilute their ownership interests again, the investors wished to sell the company to a large pharmaceutical company that could afford to fund the research. Eventually, a Norwegian corporation, Nycomed, entered into an option-to-purchase agreement on October 6, 1988. On April 3, 1989, Nycomed exercised its option and purchased all the shares of Salutar for $55 million. Nycomed required from Steven a three-year employment agreement and a covenant not to compete for two years after that. All the shareholders, in fact, were required to sign one-year covenants not to compete.

The purchase agreement allocated a portion of the $3 paid for each share to the one-year agreement not to compete. Shareholders were not paid that assigned portion until they executed the agreement. One other Salutar employee besides Steven was required to enter into a four-year noncompetition agreement.[1]

The trial court found that if Steven had not agreed not to compete, he could have earned $2 million during the five years. The court found that he

[1]Steven's contract was a three-year employment contract followed by an agreement not to compete for two years, and Dr. Scott Rocklage's contract was a two-year employment

had earned $480,000 in salary for the first three years, and that he was likely to earn $200,000 in the next two years, making a total of $680,000. Subtracting that sum from the $2 million Steven might have earned, the court set the value of Steven's detriment at $1,320,000. Then the trial court decided that since the community owned only 14 percent of the Salutar stock, that the community should be charged with only 14 percent of Steven's detriment, or $181,722 discounted to present value.

## Procedural History

Steven filed his dissolution petition on March 10, 1989. Steven alleged the date of separation was August 28, 1988, and Judy alleged the date of separation was February 21, 1989. The trial court adopted the later date.

The status of the marriage was terminated on September 25, 1989. The parties stipulated to have the property issues tried by a retired judge, sitting as a temporary judge. (Cal. Rules of Court, rule 244.) The parties agreed to have the issues of child support, spousal support and attorney fees heard separately, after the trial of the property issues.

The trial of the property issues was held during March and April of 1991. The further judgment on reserved issues was entered on December 23, 1991. This appeal followed.

## Discussion

### 1. The Five-year Covenant Not to Compete

The trial court found that, because of the covenant not to compete, Steven suffered a detriment of $1,320,000 over the five years following the sale of Salutar. Steven challenges the trial court's ruling that the community should bear only 14 percent of that loss, and that the rest should be borne by the other shareholders of Salutar.

The trial court is required to divide the community property equally. (Civ. Code, § 4800, subd. (a).) On appeal we review a ruling dividing property under the abuse of discretion standard. (*In re Marriage of Kozen* (1986) 185 Cal.App.3d 1258, 1262 [230 Cal.Rptr. 304].) Factual findings are upheld if supported by substantial evidence. (*In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 162 [267 Cal.Rptr. 31].)

The one published California case on evaluating covenants not to compete in the context of dissolution of marriage is *In re Marriage of Czapar* (1991)

contract followed by a two-year agreement not to compete. These may logically be treated as noncompetition agreements.

232 Cal.App.3d 1308 [284 Cal.Rptr. 41]. In *Czapar* the trial court determined the value of the community property business and awarded it to the husband. First the court set a value and then it subtracted $150,000 for a future covenant not to compete that the husband would have to make, if he sold the business some time in the future. (*Id.* at pp. 1312-1313.) The Court of Appeal reversed on that point. Ordinarily, when the covenanting spouse is reimbursed for a promise not to compete after separation, that payment is separate property. (*Id.* at p. 1314.) "However, it is inappropriate when awarding the property to one spouse to reduce the value of the business by the speculative value of a hypothetical noncompetition agreement." (*Ibid.*)

Clearly *Czapar* is distinguishable since there was no actual covenant not to compete to be evaluated. It does stand for the proposition, however, that it is proper to take into account the value of the covenanting spouse's covenant not to compete in evaluating the community's interest in the sale proceeds of a business.

*In re Marriage of Czapar, supra*, 232 Cal. App.3d at page 1314, looked to cases decided in other community property states. In *Lucas* v. *Lucas* (1980) 95 N.M. 283 [621 P.2d 500, 501], the New Mexico Supreme Court reviewed the division of a community property business in a marital dissolution action. The community owned some stock in a funeral home which the husband operated. A corporation purchased all of the stock of the business, and required the husband not to compete in the county as a mortician for 10 years. For the covenant not to compete the husband was to be paid $10,000 per year.

The trial court had held that the compensation for noncompetition was community property because it was actually additional payment for the stock. The supreme court disagreed. The evidence showed that the price paid for the stock was more than fair and reasonable. The sale was consummated after the marriage was dissolved. (621 P.2d at p. 501.) After the community ceased to exist, the husband's right to compete was personal, and payment for not competing was separate property. (*Id.* at pp. 501-502.) The case was reversed and remanded on this issue. (*Id.* at p. 503.)

*Czapar* also mentions *Carr* v. *Carr* (1985) 108 Idaho 684 [701 P.2d 304, 306, 59 A.L.R.4th 1063] in which the Idaho Court of Appeals reviewed the division of a business after marital dissolution. The husband and wife owned a successful truck stop. (*Ibid.*) The trial court determined the value of the business and assigned no value to its goodwill. When the husband did not buy out the wife's share, the business was ordered sold in order to divide the proceeds. (*Id.* at p. 307.) Purchasers insisted on a five-year noncompetition

agreement from the husband. The trial court awarded slightly more than half the sale proceeds to the wife. (*Ibid.*) The appellate court held that since buyers required a noncompetition agreement from the husband, the goodwill of the business must have some value. (*Id.* at p. 309.) Since the husband would not be able to compete for five years, it was possible than an unequal division in his favor, awarding him more than half the goodwill value, would be appropriate. (*Id.* at p. 310.) The court reversed and remanded. (*Id.* at pp. 310-311.)

The instant case is like *Lucas*, in that the community owned only some stock in a business. It also resembles *Lucas* in that all the shareholders were fairly compensated for the stock. The trial court's finding here that payment for the stock was simply that and not payment for Steven's noncompetition agreement is supported by substantial evidence. This case resembles *Carr* in the recognition that when the husband suffers a postseparation detriment by not competing, it may be that, equitably, the detriment, or some of it, must be absorbed by the community. In *Carr* the court suggested that more than half the goodwill value of the business should be awarded to the husband.

▇ What makes the instant case unique is that Steven's postseparation promise not to compete gave the community property stock value, and that without his promise the stock would have been valueless. Ordinarily, affirmative compensation for a promise not to compete after separation would be separate property (Civ. Code, § 5118), but here the covenanting spouse suffered a detriment and that detriment gave value to the community property stock. Although the trial court's assigning only 14 percent of the detriment to the community because it only owned 14 percent of the stock has some surface appeal, it does not withstand thoughtful analysis. The community earned about $7.5 million because of Steven's promise not to compete. Steven suffered a detriment of $1,320,000 because of his promise not to compete. There was no mechanism by which the other shareholders could bear the other 86 percent of Steven's detriment. In equity the community must bear the entire loss Steven suffered. We find the trial court abused its discretion in assigning only 14 percent of the loss to the community; the whole detriment should be borne by the community.

## 2. *The One-year Covenants Not to Compete*

The Nycomed-Salutar purchase agreement contained a unique provision requiring all the shareholders to sign one-year noncompetition agreements, and assigning a portion of the $3 per share purchase price to the noncompetition agreement. We assume shareholders were asked not to compete because a number of them were employees or former employees of Salutar.

The agreement assigned a value of $6.9 million of the $55 million purchase price to these promises not to compete.

The trial court found that these provisions related to an internal tax device of Nycomed and not to the actual value of noncompetition agreements, and this finding is supported by substantial evidence. One such item of evidence was the indemnification agreements Nycomed entered into with Salutar shareholders, holding them harmless for any adverse tax consequences resulting from this characterization. The trial court's ruling on this issue was correct.

### 3. *Attorney Fees*

The trial court ordered Steven to pay $100,000 of Judy's attorney fees, apparently based on Civil Code section 4370.6. That section allows an award of attorney's fees as a sanction when the conduct of a party and/or his attorney frustrates the law's policy of promoting settlement and of promoting cooperation to reduce the cost of litigation. Civil Code section 4370 authorizes an award of attorney fees based on need, and section 4370.5 authorizes one when it is just and reasonable, taking into account need as one factor. Section 4370.6, on the other hand, allows a punitive award without respect to need, except an award may not be made if it imposes an unreasonable burden on the sanctioned party. (See Civ. Code, § 4370.6, subd. (a).)[2]

We conclude the trial court properly awarded fees under section 4370.6. While in its remarks at the attorney fees hearing the court stated that Steven should not be punished for taking a hard line, the court also stated that some of his conduct was unsupportable.

According to Judy's attorney, the case was on the verge of settlement when Steven changed law firms. Steven managed the proceeds from the sale of Salutar stock and was required to account for them. The record is replete with documentation of his delays and obstructions and apparent absolute refusal to do so, for roughly two years, forcing Judy's attorneys to bring motion after motion to get him to comply. The trial court found Steven's conduct with respect to the accounting unsupportable, and his attorneys' conduct in the Miura depositions "an abomination," and found both were instances of sanctionable willful misconduct. While managing the community's assets Steven made a questionable loan which is the subject of his

---

[2]The party requesting fees need not show need by the terms of the statute, but such an award should always be made in light of the parties' financial circumstances. (*In re Marriage of Hublou* (1991) 231 Cal.App.3d 956, 964 [282 Cal.Rptr. 695].)

second appeal. He caused most of his assets to be illiquid, violated the court's restraining orders regarding the Salutar proceeds, and generally obstructed the progress of the proceedings. Apparently this behavior was due to the fact he did not "believe" in community property and thought that all the community property should be his.

The policy of the law is to promote settlement and to encourage cooperation which will reduce the cost of litigation. Taking an unreasonable position and shopping around for a law firm willing to support that unreasonable position is something more than simply taking a hard stand and aggressively litigating it. Steven's failure to cooperate in simple discovery matters and in making the accounting led to the appointment of an expert to make the accounting. The failure to account and the possible mismanagement of the community funds finally led to the court's appointing a trustee to manage the funds, increasing the cost of the litigation.

Steven argues that the only attorney fees before the court were incurred after his wrongful conduct, and that the award is therefore improper. We reject this argument. The statute, we think, contemplates assessing a sanction at the end of the lawsuit, when the extent and severity of the party's bad conduct can be judged. Steven also asserts that the sanctions must be limited to the cost to the other side resulting from the bad conduct. *In re Marriage of Niklas* (1989) 211 Cal.App.3d 28 [258 Cal.Rptr. 921], on which Steven relies, is inapposite. The sanctions there at issue were discovery sanctions, and the governing statute required that the sanctions could only be the amount of costs and fees incurred by the other side as a result of the bad conduct. (Code Civ. Proc., § 2023, subd. (b)(1).) There is no such limitation in Civil Code section 4370.6.

Steven argues that the order violates due process because he did not have notice that his earlier bad conduct was at issue, and the order is fatally flawed because the court did not make a written order detailing its reasons. We reject both these arguments. The moving papers make clear that the early instances of Steven's uncooperative conduct are described as examples to illustrate the tone of the conduct of the litigation, and that attorney fees as a punitive sanction are sought. Steven's attorney responded by arguing that imposition of fees would result in an unreasonable burden under section 4370.6, so he clearly understood what was at issue. The statute does not require a written order, nor did Steven request a statement of decision. That Steven was sanctioned before for the same bad conduct is also of no importance. The statute contains no such limitation. There was no showing that the sanction places an unreasonable burden on Steven. The trial court did not abuse its discretion in making this attorney fee award. (*In re*

*Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769 [209 Cal.Rptr. 354, 691 P.2d 1020].)

### Summary of Second Case

After Steven petitioned for dissolution of the marriage, he continued to manage the community's assets. He controlled the proceeds from the sale of Salutar stock, some $7.5 million. Greg and Cheryl Forbes were friends of Steven and Judy. After the initial distribution of Salutar sales proceeds, Greg Forbes asked Judy to lend him $100,000 for his company. Judy consulted her financial adviser who counselled against the loan, and Judy declined to make a loan to Forbes. In October of 1990, while Steven was managing the Salutar proceeds, the account was under some restraining orders from the court. After Steven's adviser said it was a prudent investment, Steven lent $986,714 to Forbes Manufacturing, Inc. (Forbes). Forbes defaulted and Steven is attempting to collect on the note. Judy moved to have the whole face value of the note assigned to Steven, and Steven requested in-kind division. The trial court assigned the note to Steven. On appeal Steven contends the trial court used the wrong standard, fiduciary duty rather than duty of good faith. Furthermore, contends Steven, even if the fiduciary duty standard is applied, there is insufficient evidence to support the finding he breached that duty. Steven also asserts that the circumstances of this case do not meet either of the two recognized exceptions to in-kind division. For the reasons stated below we affirm.

### Additional Facts

Steven requested and was granted the right to manage the Salutar proceeds, subject to several restraining orders. On September 1, 1989, the court filed a stipulation and order which precluded either party from "transferring, encumbering, hypothecating, concealing or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, except in the usual course of business or for the necessities of life." On May 10, 1990, the court filed a stipulation and order regarding the remaining funds in the escrow account, which stated: "Both petitioner and respondent are restrained from any further use of the funds currently held in an escrow account containing the balance of the proceeds from the sale of Salutar, Inc. absent further written agreement." On September 26, 1990, the court froze the account, and denied without prejudice Judy's request for joint management. The court also ordered Steven to provide an accounting of the funds.

When Forbes asked Judy to lend him money, she declined. Steven was aware that Judy had decided not to lend Forbes any money. Steven's

financial consultant advised him that it was a prudent investment. Steven lent the money to Forbes at a time when the escrow account was frozen. Before Steven lent the money, Judy had requested at least once that Steven be removed as manager of the community property. The trial court awarded the whole face value of the note to Steven in its division of the community property.

## Discussion

Steven's central contention on appeal is that both parties should have shared equally in the Forbes note. Steven contends that the trial court used the wrong standard, fiduciary duty rather than good faith. He also contends that, even if the fiduciary duty standard were applied, substantial evidence does not support the finding of breach. We conclude Steven's arguments are without merit.

At the time Steven lent the money, each spouse owed the other spouse a duty of good faith in the management of the community's property. (*In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 682 [261 Cal.Rptr. 9].) The managing spouse's duty extended up until the property was divided by the parties or by a court. (*In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 90-91 [260 Cal.Rptr. 403].) The statute has since been amended to provide for a fiduciary duty on the part of one spouse toward the other. (Civ. Code, § 5125, subd. (e).)

In this case the trial court recognized that the statute had been amended recently to impose the higher standard of fiduciary duty. The trial court reasoned, however, that because of the unique circumstances of the case, the fiduciary standard applied. These circumstances were that the court allowed Steven to manage the funds over Judy's objection and that the account was under restraining orders from the court. Steven knew that Judy did not want to lend money to Forbes. The parties were in adverse positions, and the right to manage the property was being litigated. Under these circumstances the trial court did not err in applying the fiduciary duty standard.

Substantial evidence supports the finding Steven breached his fiduciary duty. Knowing Judy did not want to lend money to Forbes, Steven did so without regard to her wishes. Taking 20 percent of one's capital and tying it up in an illiquid investment and making a loan, based on friendship, to a company whose financial situation was uncertain are not the hallmarks of a prudent fiduciary. The account had been frozen by the court, and a prior order required Steven to get Judy's written consent before disbursing funds. Steven violated those court orders when he made the Forbes loan.

Considerable discretion is vested in the trial court in terms of its division of community property. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 603 [153 Cal.Rptr. 423, 591 P.2d 911].) When circumstances warrant, the court may assign a risky investment wholly to one spouse rather than dividing it by in-kind division. (*Ibid.*) We detect no abuse of discretion here.

We will grant Judy's request for a remand for consideration of her request for attorney fees on appeal. (Civ. Code, §§ 4370, 4370.6; *In re Marriage of Green* (1992) 6 Cal.App.4th 584, 588 [7 Cal.Rptr.2d 872].)

## *Disposition*

H009495: We reverse the trial court's order assigning 14 percent, rather than 100 percent, of Steven's detriment to the community and remand for further proceedings. The further judgment on reserved issues is otherwise affirmed. With respect to Judy's cross-appeals, the trial court is authorized, but not required, to reconsider the issues to which the cross-appeals relate.

H009803: The trial court's order assigning the Forbes note to Steven is affirmed. The case is remanded for consideration of Judy's request for attorney fees on appeal.

Each party to bear his/her own costs and fees in both cases, except as determined by the trial court on remand.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied September 8, 1993, and the petition of appellant Judy Quay for review by the Supreme Court was denied December 2, 1993. Panelli, J., was of the opinion that the petition should be granted.