[No. B136160. Second Dist., Div. One. May 31, 2001.]

In re the Marriage of PATRICIA A. and VINCENT J. DUFFY.
PATRICIA A. DUFFY, Appellant, v.
VINCENT J. DUFFY, Appellant.

## COUNSEL

Honey Kessler Amado and Diane E. Berley for Appellant Patricia A. Duffy.

Law Offices of Bruce Adelstein and Bruce Adelstein for Appellant Vincent J. Duffy.

## OPINION

### SPENCER, P. J.—

#### INTRODUCTION

Vincent J. Duffy appeals from that portion of the judgment which finds that he breached his fiduciary duty of disclosure to his spouse, Patricia A. Duffy, and awards her damages for the breach of $400,684. Patricia Duffy appeals from that portion of the judgment which denies her attorney's fees incurred in asserting and trying her breach-of-fiduciary-duty claim. We reverse the lower court's breach-of-fiduciary-duty findings. In all other respects, we affirm the judgment.

#### STATEMENT OF FACTS

Vincent J. and Patricia A. Duffy were married on December 1, 1962. After 34 years of marriage, they separated on January 28, 1997.

Vincent Duffy received an undergraduate degree in business from Seton Hall in 1959. He attended graduate school. Patricia Duffy received an undergraduate degree in English from Hunter College in 1964. She took no finance or accounting courses while attending college.

Patricia Duffy worked briefly after the parties married. She stopped working, however, when the first of their seven children was born. She returned to work in 1991 after obtaining a teaching credential.

Early in the parties' marriage, Patricia Duffy managed the parties' checkbook. She failed to record checks or to add and subtract correctly, however. In her words, her management of the checkbook was "a disaster." She had never managed a checking account before and had no experience with managing finances. Vincent Duffy consequently took complete charge of the family finances.

At some point in their marriage, Vincent and Patricia Duffy purchased a 4,200-square-foot residence on one-third of an acre in Woodland Hills. They discussed the purchase before making it but Patricia did not ask the purchase price of the residence. She read and signed the purchase papers, however.

During the parties' marriage, Vincent Duffy made a series of investments. In 1977, he and Patricia Duffy purchased unimproved real estate in Leona Valley for $91,000. They discussed the investment beforehand. Although

Patricia did not ask and Vincent did not tell her the purchase price, she signed the purchase papers. The property appreciated nicely in value over the years, selling in November 1997 for $800,000.

Sometime before 1983, Vincent Duffy invested $40,000 in an auto body shop he was to own jointly with its operator. Patricia Duffy learned about this investment after the fact. She did not know how much Vincent had invested in the shop. She did not ask. She explained that "usually when I asked him questions about money, I was given a very dismissive wave of the hand type answer." She had asked Vincent questions about money before he made the auto body shop investment but usually did not receive answers, or received very curt ones. Over the years, Vincent Duffy invested additional sums in the shop. He did not discuss these additional investments with Patricia. She did receive additional information about this investment upon request, however. She knew the auto body shop was not making money, knew enough money had to be produced each month to pay the rent, and eventually learned that the investment was tied up for a five-year lease term on the auto body shop. At one point she objected to the investment, believing the other investor was taking too much money from the business. The investment was a total loss.

At some point, the parties and a partner, Larry Brown, invested in a house in Bullhead City, Arizona. Patricia Duffy knew about the investment beforehand. She knew the purchase price. When the partners sold the house several years later, she was aware of the sale price. Upon inquiry, she learned there were problems with the sale of the Bullhead City property. She knew the partners had not been paid and were litigating the matter in court.

At one point, Vincent Duffy loaned $50,000 to the son of a childhood friend to start a nightclub in Atlanta. The loan is secured by the real property upon which the nightclub stands. When Patricia Duffy asked, Vincent Duffy told her about this investment in general terms. He did not provide details. Patricia did not ask how much Vincent was investing in this venture.

Patricia and Vincent Duffy discussed ahead of time their purchase of a time-share in Cabo San Lucas, Mexico. They specifically discussed the purchase price.

As part of Vincent Duffy's severance package from MCA Records in 1983, he received $157,590.40 from a profit-sharing plan and 3,901 shares of MCA stock from two separate stock plans. He initially rolled over the profit-sharing proceeds into the individual retirement account (IRA) at Investment Savings & Loan Association. Patricia Duffy accompanied him when he did this.

Vincent Duffy later opened a brokerage IRA account with Sean Dillon (Dillon), a stockbroker at Paine Webber and the son of a childhood friend. Patricia Duffy was aware that Vincent had opened a brokerage account. Upon Dillon's recommendation, Vincent sold the MCA stock.

At some point between 1993 and 1995, Vincent Duffy transferred the account to Ed Flynn (Flynn) of Hanifen Imhof, another stockbroker who was the son of a childhood friend. He told Flynn that his investment objectives were to make a lot of money and to be safe and conserve the account.

In February 1995, the value of the IRA brokerage account was $482,925. At the time, the portfolio contained nine stocks. Flynn recommended that Vincent Duffy sell these stocks and buy five specific technology stocks, one of which was Excalibur Technologies Corp. (Excalibur). This company sells software, including a new type of internet video software, to commercial businesses and government agencies in North America, Europe and elsewhere. Flynn told Vincent that this was a good solid stock about to increase in value. Vincent Duffy followed Flynn's recommendations.

Between April and December 1995, shares of Excalibur increased in value from approximately $13 per share to $26 per share. On Flynn's recommendation, Vincent bought and sold Excalibur at different prices during this period. By November 1995, the value of the brokerage account had increased to $611,648.

Sometime in 1995, Flynn suggested that Vincent Duffy invest the entire portfolio in Excalibur. Vincent followed that advice sometime in 1996. By July 1996, the value of the brokerage account had declined to $297,309. Vincent Duffy expressed concern but Flynn reassured him. The brokerage account remained invested solely in Excalibur. In February 1997, the price of Excalibur's shares dropped precipitously, reaching a low of $3.75. Vincent Duffy ceased trading in the stock. By May 1998, the price had returned to $13.50 per share. The value of the brokerage account was $261,483.

Before the parties separated, Patricia Duffy saw some brokerage statements that had been mailed to the house, as well as prospectuses and other investment materials. She realized the MCA stock was not reflected on these statements but asked no questions about this. She asked no questions whatsoever about the brokerage account. For a brief period of time when Flynn moved to another brokerage house, Vincent Duffy had the statements mailed to his office.

According to expert witnesses, the investments in the IRA account were far too risky and lacked adequate diversification. Had the MCA assets been

invested in a more conservative manner, the yield would have been far higher. One expert calculated damages for Vincent Duffy's alleged breach of fiduciary duty by using the difference between the highest value of the IRA account and its value in May 1998.

## CONTENTIONS

*On Appeal*

### I

Vincent Duffy contends the evidence is insufficient to support the trial court's finding that he breached his fiduciary duty of full disclosure.

### II

Vincent Duffy further contends the finding cannot be upheld on the ground that he breached some other fiduciary duty.

### III

Vincent Duffy asserts the trial court employed the wrong measure of damages and erroneously included interest in the award.

*On Cross-appeal*

### IV

Patricia Duffy contends the trial court erred in failing to award her attorney's fees.

## DISCUSSION

*On Appeal*

### I

Vincent Duffy contends the evidence is insufficient to support the trial court's finding that he breached his fiduciary duty of full disclosure. We agree.

With limitations that are irrelevant to this case, Family Code section 1100, subdivision (a), reposes in either spouse "the management and control of the community personal property, . . . with like absolute power of disposition,

other than testamentary, as the spouse has of the separate estate of the spouse." Subdivision (e) of section 1100 provides that "[e]ach spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . , and to provide equal access to all information, records, and books that pertain to the value and character of those assets . . . *upon request*." (Italics added.)

Family Code section 721, subdivision (b), upon which section 1100, subdivision (e), relies for definition of the scope of spousal fiduciary duty, provides that "[e]xcept as provided in Sections 143, 144, 146, and 16040 of the Probate Code, . . . a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 15019, 15020, 15021, and 15022 of the Corporations Code, including the following: [¶] (1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying. [¶] (2) Rendering *upon request*, true and full information of all things affecting any transaction which concerns the community property. . . . [¶] (3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns community property." (Italics added.)

The duties specified in Family Code section 721, subdivision (b), are derived from the Corporations Code sections upon which subdivision (b) relies. Former Corporations Code section 15019 (now § 16503) gave a partner the right to have access to, inspect and copy books of account. Section 15020 (now § 16403) conferred the right to disclosure, on demand, of information regarding the partnership business. Section 15021 (now § 16404) required accounting for the benefits or profits derived from a partnership or benefits derived by a partner's use of partnership property. Section 15022 specified when a partner was entitled to a formal accounting.

The lower court found that, upon his termination from MCA Records after approximately 23 years of employment, Vincent Duffy received his

interest in the MCA Records profit-sharing plan, or $157,590.40 in cash, which he rolled over into an IRA at Investment Savings & Loan Association. He also received 3,117 shares of MCA Records stock from a stock investment plan and an additional 784 shares of stock from another company plan. The court further found that Vincent Duffy thereafter made investments of these assets without consulting with Patricia Duffy or obtaining her advice or agreement. "While [Vincent Duffy] told [Patricia Duffy] about an initial investment, he did not tell her about subsequent investments, assuming she would realize he was making such investments, nor did he tell her that he was using funds from the MCA profit sharing IRA rollover to make these subsequent investments. Further, [he] did not tell [her] how he invested the 3,901 shares of MCA stock he received . . . ."

The court also found that "[f]rom time to time throughout the marriage, [Patricia Duffy] attempted to question [Vincent Duffy] about financial affairs. When she did, he usually did not respond or if he did, [he] was very curt, treated her in a dismissive manner, indicating she was not to talk about it." Inasmuch as "there were requests by [Patricia Duffy] for economic information which [Vincent Duffy] ignored," the court found that Vincent Duffy had breached his fiduciary duty of full disclosure with respect to investment of the MCA assets. ▪▪▪ At no point in its findings does the court mention any of the community's other investments.[1]

▪ It is settled that appellate review of the sufficiency of the evidence is governed by the substantial evidence rule. (Cf. *Bixby v. Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].) This court views the entire record in the light most favorable to the prevailing party to determine whether there is substantial evidence to support the trial court's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; accord, *Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) We must resolve all conflicts in the evidence and draw all reasonable inferences in favor of the findings. (*Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1289 [261 Cal.Rptr. 204].) Substantial evidence is evidence of ponderable legal significance. (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871 [269 Cal.Rptr. 647]; *Bowers, supra,* at p. 873.)

---

[1]Although it is not clear, the court may have limited its findings in this manner due to the age of the parties' other community property investments. The change in the standard applicable when both spouses have a right to manage and control community personal property, from "good faith" to fiduciary duty, through amendment of former Civil Code section 5125, subdivision (e), effective 1992, does not apply retroactively. (*In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1439-1440 [28 Cal.Rptr.2d 726].)

 Patricia Duffy had no financial training or background. Prior to marriage, she had no experience in handling finances. Her attempt at handling the parties' finances early in their marriage was, as she acknowledged, "a disaster." Thereafter, Vincent Duffy generally handled finances.

Sometime before 1983, Vincent Duffy had invested $40,000 in an auto body shop. He subsequently invested additional sums. The investment was a total loss. Patricia Duffy acknowledged that she knew of this investment. When asked whether she had asked Vincent Duffy how much he was investing, she said she had not done so. When asked why, Patricia explained, "Well, usually when I asked him questions about money, I was given a very dismissive wave of the hand type answer." She had asked him questions about money before he made the auto body shop investment but usually did not receive answers, or received only very curt ones. With respect to this investment, she did receive some material information upon request, however. She knew the auto body shop was not making money, knew enough money had to be produced each month to pay the rent, and eventually learned that the investment was tied up for a five-year lease term on the auto body shop.

Patricia Duffy had participated in the 1977 purchase of unimproved real property in Leona Valley. She also knew about their investment in a house in Bullhead City, Arizona, before it took place. She knew the purchase price. When Vincent Duffy and his partner sold the property, she knew the sales price. She also learned, upon inquiry, that there were problems with the sale and that the parties were litigating the sale in court. Patricia Duffy had some information about the Atlanta nightclub for which Vincent Duffy had made a loan, although she knew no details. She asked no detailed questions.

Patricia and Vincent Duffy discussed ahead of time their purchase of a time-share in Cabo San Lucas, Mexico. They specifically discussed the price.

Patricia Duffy accompanied Vincent Duffy when he rolled over his profit-sharing proceeds into the IRA at Investment Savings & Loan Association. She was aware that he opened a brokerage account. Before the parties separated, she saw some brokerage statements that had been mailed to the house. She realized the MCA stock was not reflected on these statements but asked no questions about this.

This is the sum total of the evidence upon which the lower court relied in finding that Vincent Duffy breached his duty of full disclosure with respect to the MCA assets. There is no evidence that Vincent Duffy ever refused to

provide information about the investment of these assets. Similarly, there is no evidence that Patricia Duffy ever asked any questions concerning the investment of these assets. To the contrary, she testified that she asked *no* questions. There is not even any evidence that Vincent Duffy continued to treat her requests for financial information in a dismissive manner after 1983. Indeed, with respect to some investments, the record reflects the contrary. Patricia Duffy could secure pertinent investment information when she sought it. She received it with respect to the Bullhead City real estate investment, the Cabo San Lucas time-share and, to some extent, the auto body shop investment.

Patricia Duffy argues that this makes no difference for two reasons. First, Vincent Duffy's historical pattern of giving her curt and dismissive answers when she sought financial information justifies the inference that he ignored her requests in this instance. As noted above, the historical pattern is inconsistent. It was possible for her to obtain information upon inquiry. Moreover, she testified directly that she asked no questions concerning investment of the MCA assets. It therefore cannot be inferred that she did ask and received no response.

Second, Patricia Duffy argues, it would have been futile for her to ask, so she was not required to do so. As we have noted, it is not clear that it would have been futile for her to ask for information. Doing so in the past occasionally had yielded results. She did not testify that she believed it would be futile or that she had been so intimidated in the past that she was afraid to ask. There is no evidence even that she had any particular interest in the status of the MCA assets. More importantly, the evidence on this point is not uncontroverted. According to Vincent Duffy, he provided Patricia with considerably more financial information than she testified he had provided. The lower court made no finding that it would have been futile for Patricia to seek information about the investment of the MCA assets. To the contrary, the court found that "there were requests by [her] for economic information which [Vincent Duffy] ignored."

■ Whether an act would have been futile normally is a question of fact. It may be determined as a question of law only if the facts are undisputed and permit only one reasonable inference. (*People ex rel. State Pub. Wks. Bd. v. Superior Court* (1979) 91 Cal.App.3d 95, 102 [154 Cal.Rptr. 54].) ■ Inasmuch as the evidence in this case does not compel an inference of futility, we cannot excuse Patricia Duffy's failure to inquire on this ground. (*Ibid.*)

In summary, there is no evidence, substantial or insubstantial, that Patricia Duffy ever sought information about the investment of MCA assets, which

information Vincent Duffy failed or refused to provide. There consequently is no evidentiary support for the trial court's finding that Vincent Duffy breached his fiduciary duty of full disclosure upon request.

## II

Vincent Duffy further contends the finding cannot be upheld on the ground that he breached some other fiduciary duty. Again, we agree.

Initially, Vincent Duffy argues that we should not consider this as an alternative means of upholding the judgment. ■ If the trial court, having selected one theory upon which to rule and rejected another, selected the wrong theory, we nonetheless may uphold the judgment on the alternate theory *unless* it is based on disputed facts. (*United Pacific Ins. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933, fn. 9 [266 Cal.Rptr. 231].) ■ Here, the facts concerning what Vincent Duffy did in making investment decisions, the investments he made, and whether these conform to a particular standard all are undisputed. We therefore may consider an alternate theory even though the trial court chose not to do so.

■ Fiduciary duty requires the fiduciary " 'to act with the utmost good faith for the benefit of the other party.' " (*In re Marriage of Reuling, supra,* 23 Cal.App.4th at p. 1438.) One is a fiduciary when one person reposes " 'confidence . . . in the integrity of another.' " (*Ibid.*) In that event, the fiduciary " 'can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent.' . . ." (*Ibid.,* citation and fn. omitted.) In some circumstances, fiduciary duty also includes a duty of care in the management of property. (See, e.g., Corp. Code, §§ 309, subd. (a), 16404.)

■ The question is whether the fiduciary duty owed by the spouse managing community assets to the other spouse includes a duty of care. Deciding this question requires statutory interpretation and some historical review.

■ In interpreting a statute, a fundamental rule is that the court must " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the intent, the court 'turns first to the words themselves for the answer.' [Citation.] [¶] The words must be read in context, ' "keeping in mind the nature and obvious purpose of the statute where they appear." ' [Citation.] In ascertaining the legislative intent, courts should consider not only the words used, but 'the object in view, the evils to be remedied, the legislative history [and] public policy . . . .' [Citation.]"

(*People v. Aston* (1985) 39 Cal.3d 481, 489 [216 Cal.Rptr. 771, 703 P.2d 111].)

Before 1975, only the husband had the right to manage and control community property. (Former Civ. Code, §§ 172, 172a.) He owed a fiduciary duty of loyalty to the wife in doing so. (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247].)

While the husband did owe a duty of loyalty, he apparently did not owe a duty of care. "As one note writer has observed: 'Evidently a husband is free to make unwise purchases, to speculate freely in stocks and securities or to use personal property foolishly without the wife's consent, for in these situations the desirability of freely transferable personal property is thought to outweigh the harm suffered by the wife.' [Citation.]" (*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 377-378 [111 Cal.Rptr. 468].) To extend the duty further, another commentator stated, would " 'hamper the exercise of his [husband's] business initiative, prejudice the rights of those who deal with him, and generally hinder commercial transactions.' " (*Id.* at p. 378.)

*Rosenthal v. Rosenthal* (1966) 240 Cal.App.2d 927 [50 Cal.Rptr. 385], upon which Patricia Duffy relies, does not suggest otherwise. There was no question in *Rosenthal* of whether the husband had breached his fiduciary duty by making speculative investments. The question was whether, after entry of an interlocutory divorce decree, the husband should be allowed to continue managing the community assets. The appellate court thought not, noting evidence "that the husband has persisted in expending large sums of community money in a highly speculative oil business." (At p. 933.) Inasmuch as "[p]ouring money into a speculative business may empty the community estate as quickly and completely as a fraudulent concealment of assets," the husband's "persistence threatens to dissipate and waste the community assets. Were the management of the community estate left to the husband and were he allowed to continue the community oil speculations in the hope of future profit, the community property would remain undivided and subject to speculative risk for an indefinite period." (*Ibid.*) In these circumstances, "the wife's interest would continue to be at her husband's mercy." (*Ibid.*) The court consequently concluded that appointment of a receiver was necessary to conserve the community assets for division and distribution.

The lesson to be learned from *Rosenthal* is simply this: postdissolution, the spouses' interests may diverge, the managing spouse willing to risk dissipation in a speculative investment in hope of greater returns in the

future, the other spouse desiring to conserve the existing estate until its division and distribution. This being the case, a spouse who had shown a propensity for making speculative investments should not be allowed to continue handling the community assets, for he cannot be relied upon to exercise his duty of good faith and loyalty. It does not suggest that a managing spouse owes a duty of care in choosing investments.

*In re Marriage of Quay* (1993) 18 Cal.App.4th 961 [22 Cal.Rptr.2d 537] is of no greater help to Patricia Duffy. In *Quay*, the trial court, over the wife's objection, allowed the husband to manage community funds while the dissolution was pending. The husband knew the wife did not want money loaned to a company owned by the husband's friend. Knowing this, the husband loaned a large sum to the company. Inasmuch as the parties were in adverse positions and the right to manage community property was being litigated, this was a breach of fiduciary duty. (At p. 972.) It was a breach of the duty of good faith and loyalty, however, not of a duty of care. Nothing in *Quay* suggests that a spouse owes a duty of care in managing community assets.

From 1975 to the 1992 revision of former Civil Code section 5125, both spouses had a joint right to manage the community personal property; the managing spouse had a duty to act in good faith in doing so. (Former Civ. Code, § 5125, subd. (e).) In 1983, the Supreme Court noted that a managing spouse's duty of disclosure "stems in part from the confidential nature of the marital relationship. . . . It also arises from the fiduciary relationship that exists between spouses with respect to the control of community property." (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 905 [191 Cal.Rptr. 629, 663 P.2d 187], citations omitted.) The asset concealed in *Modnick*, however, was a bank account opened in 1970 into which the husband had deposited sums during the marriage. (*Id.* at p. 902.) The dispute thus was over a pre-1975 asset. *Modnick* consequently does not stand for the proposition that the duty of good faith found, as of 1992, in the amended version of former Civil Code section 5125, subdivision (e), is the same as the fiduciary duty the husband previously owed to the wife.

Recognizing this, a series of cases, beginning with *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051 [202 Cal.Rptr. 116], held that the amendments to former Civil Code sections 5125 and 5127 "changed the fiduciary duty to one of good faith." (*Stevenot*, at p. 1068.) This is "a lesser duty." (*Ibid.* and p. 1070; see also *In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 163-164 [267 Cal.Rptr. 31]; *In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 679 [261 Cal.Rptr. 9]; but see *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 90, 91 [260 Cal.Rptr. 403]; *In re Marriage of Munguia* (1983) 146 Cal.App.3d 853, 859 [195 Cal.Rptr. 199].)

These cases are correct. ■■■ "Good faith" and fiduciary duty are not coextensive. "Good faith" " 'encompass[es], among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage . . . . Honesty of intention . . . .' [Citation.]" (*In re Marriage of Reuling, supra,* 23 Cal.App.4th at p. 1438.) Fiduciary duty, in contrast, requires that the fiduciary act with " 'the utmost good faith for the *benefit* of the other party.' " (*Ibid.,* italics added.) Complying with fiduciary duty requires more than " 'honesty of intention,' " or good faith. (*Ibid.*) It requires loyalty, or a commitment to not secure any advantage, in opposition to the other party, without that party's knowledgeable consent. (*Ibid.*) A breach of loyalty could occur simply from seizing an excellent investment opportunity for the benefit of one's personal property rather than for the benefit of the community estate. A breach of good faith would require more egregious conduct, i.e., the misuse and misappropriation of community business income for one's personal use. (*In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1318 [285 Cal.Rptr. 479].)

■■■ The *Stevenot* court held that the duty of good faith "requires the disclosure of all community assets, but not their valuation unless the valuation or factors affecting the valuation are peculiarly within the knowledge of one spouse, and reasonable inquiry and use of discovery proceedings by the other spouse would fail to disclose them." (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1070.) Unhappy with this conclusion, the Legislature passed Assembly Bill No. 2194 in 1989. The bill provided that, in the management and control of community property, the managing spouse owed the other spouse a fiduciary duty. (Assem. Bill No. 2194, §§ 2, 3.)

Then Governor George Deukmejian vetoed the bill on September 25, 1989. In his veto message, he stated, "I believe the intent of this bill to clarify marital property management standards and protect both spouses regarding community property assets is laudable. However, I am concerned that this legislation will increase litigation and the attendant costs of divorce proceedings. . . . This bill could severely impact the doctrine of finality [of a judgment] by allowing either spouse, even many years later, to appeal to a court to set aside a judgment and marital settlement agreement, based upon a claimed breach of fiduciary duty.

"An aggrieved divorcing spouse should have a forum to seek redress for significant wrongs committed during the marriage by the other spouse. However, I am concerned that, to the extent that an investment made during a marriage lost money and was one that a prudent fiduciary would not have made, this bill would provide a forum to reopen virtually all of those transactions. Since spouses regularly make investments that fiduciaries

would never make, and because the disillusionment and distrust engendered by marital breakup often leads individuals to expand litigation beyond reasonable limits, obvious problems are created. . . ."

In 1991, the Legislature again attempted to amend the standard applicable to management and control of community property, introducing Senate Bill No. 716 (1991-1992 Reg. Sess.). Section 1 of the bill stated, "The Legislature finds and declares that it is the public policy of this state that marriage is an equal partnership and that spouses occupy a confidential and fiduciary relationship with each other, whereby each spouse places trust and confidence in the integrity, honesty, and fairness of the other spouse." The bill amended Civil Code sections 5103 and 5125 (since repealed and replaced with Fam. Code, §§ 721 & 1100) to so state.

As originally written, the bill amended subdivision (b) of former Civil Code section 5103 to provide that "[e]xcept as provided in Sections 143, 144, and 146 of the Probate Code,[2] in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. A husband and wife are guaranteed the same good faith standard as the law provides to nonmarital business partners, as provided in Sections 15019, 15020, 15021, and 15022 of the Corporations Code, including, but not limited to," certain enumerated rights. (Sen. Bill No. 716 (1991-1992 Reg. Sess.) § 2.)

The bill amended subdivision (e) of former Civil Code section 5125 to state that "[e]ach spouse shall act with respect to the other spouse in the management and control of the community property in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 5103, until such time as the property has been divided by the parties or by a court." (Sen. Bill No. 716 (1991-1992 Reg. Sess.) § 3.) It then specifies the scope of a spouse's duty of disclosure. (*Ibid.*)

The Assembly Judiciary Committee Report noted Governor Deukmejian's reasons for vetoing Assembly Bill No. 2194. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2194 (1991-1992 Reg. Sess.) p. 1.) Thereafter, the Assembly amended the bill to provide, in subdivision (b) of former Civil Code section 5103, that, "[e]xcept as provided in Sections 143, 144, *146, and 16040* of the Probate Code, . . . a husband and wife are subject to the

---

[2]Probate Code sections 143, 144 and 146 delineate the circumstances in which a spouse's waiver of inheritance rights, testamentary rights and/or certain rights conferred by the Probate Code will be valid.

general rules governing fiduciary relationships . . . . *This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is analogous to the fiduciary relationship of nonmarital business partners, as provided in* Sections 15019, 15020, 15021, and 15022 of the Corporations Code, including, but not limited to," certain enumerated rights. (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 716 (1991-1992 Reg. Sess.) as amended Aug. 19, 1991, italics added to indicate amendments made.) The bill was amended further to provide that the confidential relationship, rather than being *analogous* to the fiduciary relationship of nonmarital partners, is a fiduciary relationship. The amendment further provided that the relationship is subject to the same rights and duties of nonmarital partners. It also eliminated the phrase "but not limited to" from enumeration of the specific rights provided. (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 716 (1991-1992 Reg. Sess.) as amended Aug. 27, 1991.) Thus amended, the bill passed both houses and became law.

The amendments have considerable significance. ■ In general, "a substantial change in the language of a statute . . . by an amendment indicates an intention to change its meaning." (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 493 [159 Cal.Rptr. 494, 601 P.2d 1030].) It is presumed the Legislature made changes in wording and phraseology deliberately (*Estate of Simpson* (1954) 43 Cal.2d 594, 600 [275 P.2d 467, 47 A.L.R.2d 991]) and intended different meanings when using different words (*Las Virgenes Mun. Wat. Dist. v. Dorgelo* (1984) 154 Cal.App.3d 481, 486 [201 Cal.Rptr. 266]).

■ When Senate Bill No. 716 became law, Probate Code section 16040, subdivision (b), imposed a duty on trustees to invest trust property "with the care, skill, prudence, and diligence under the circumstances then prevailing, including but not limited to the general economic conditions and the anticipated needs of the . . . beneficiaries, that a prudent person acting in a like capacity and familiar with such matters would use . . . to accomplish the purposes of the trust . . . ." In excepting from the fiduciary duty spouses owe to one another this prudent investor rule, the Legislature unequivocally removed one duty of care.[3]

Similarly, by narrowing the scope of the fiduciary duty to rights specifically enumerated therein, the Legislature removed another duty of care. The

[3]In 1995, the Legislature adopted the Uniform Prudent Investor Act. The prudent investor rule now can be found in Probate Code section 16047, subdivision (a). This is of no significance, for the amendment to former Civil Code section 5103, subdivision (b), nonetheless carries with it the meaning given Probate Code section 16040 at the time the amendment was made. (*People v. Superior Court (Lavi)* (1993) 4 Cal.4th 1164, 1176, fn. 7 [17 Cal.Rptr.2d 815, 847 P.2d 1031].)

Legislature did this by deleting the phrase "but not limited to" from the phrase "including, but not limited to," the enumerated rights. The enumerated rights directly echo the rights found in the sections of the Corporations Code that former Civil Code section 5103, subdivision (b), identified as delineating the scope of spouses' fiduciary duty. By limiting the rights to those enumerated, and echoed by specific Corporations Code provisions, the Legislature eliminated the possibility that subdivision (b) could be interpreted expansively to include the duty of care a nonmarital partner owes another nonmarital partner, as set forth in Corporations Code section 16404. In other words, by including certain Corporations Code provisions while eliminating the expansive words, "but not limited to," the Legislature necessarily excluded all other provisions. (*People v. Weatherill* (1989) 215 Cal.App.3d 1569, 1578-1579 [264 Cal.Rptr. 298].)

When Civil Code sections 5103 and 5125 were repealed in 1994 and replaced by Family Code sections 721 and 1100 (Stats. 1992, ch. 162, § 10, pp. 487, 496 operative Jan. 1, 1994), there were no significant changes in language. Family Code section 721, subdivision (b), in fact, contains language identical to that found in former Civil Code section 5103, subdivision (b). Family Code section 1100, subdivision (e), has only minor changes in language that do not affect the meaning of the provision. Former Civil Code section 5125, subdivision (e), spoke of "the management and control of the community property." Subdivision (e) of Family Code section 1100 changes "property" to "assets and liabilities." It replaces "Section 5103" with "Section 721." In all other respects, the language is unchanged. The meaning of the Family Code provisions therefore is identical to that of the former Civil Code provisions.

In short, a spouse generally is not bound by the prudent investor rule and does not owe to the other spouse the duty of care one business partner owes to another.[4] *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987 [80 Cal.Rptr.2d 699] does not hold otherwise. In *Hokanson*, the wife was guilty of dilatory conduct and of withholding material information when disposing of the community residence in a falling real estate market *after* the judgment of dissolution was filed and *in violation of a court order* to act as expeditiously as possible. This was a breach of fiduciary duty. (At pp. 990-991.) Again, however, this case does not involve a duty of care. The parties' interests had diverged. Having been given management of the particular asset and being under a court order to act expeditiously, the wife necessarily would breach a fiduciary duty of *good faith* by withholding information from her spouse and acting in a dilatory manner while the value of the asset decreased.

---

[4]While a spouse may become an involuntary trustee, in which case the prudent investor rule may apply, this only occurs when that spouse fraudulently obtains the other spouse's separate property. (*Shaw v. Bernal* (1912) 163 Cal. 262, 271 [124 P. 1012].)

To summarize, Vincent Duffy did not owe Patricia Duffy a duty of care in investing the community assets. Inasmuch as Vincent Duffy owed Patricia Duffy no duty of care, he cannot have breached that duty.

## III

Vincent Duffy asserts the trial court employed the wrong measure of damages and erroneously included interest in the award. Inasmuch as the judgment must be reversed for insufficiency of the evidence, we need not reach the merits of this assertion.

*On Cross-appeal*

## IV

Patricia Duffy contends the trial court erred in failing to award her attorney's fees. Once again, inasmuch as the judgment must be reversed, we need not address this contention.

The judgment is reversed insofar as it finds that Vincent Duffy breached a fiduciary duty owed to his spouse, Patricia Duffy, and awards damages therefor. In all other respects, the judgment is affirmed. Appellant Vincent Duffy is to recover costs on appeal.

Vogel (Miriam A.), J., and Mallano, J., concurred.