Filed 6/22/15  Marriage of Zhang and Zheng CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JIANYI ZHANG and LUO ZHENG. | D067441 |
| JIANYI ZHANG, Respondent, v. LUO ZHENG, Appellant. | (Super. Ct. No. FAMRS1101550) |

APPEAL from an order of the Superior Court of San Bernardino County, Michael Knish, Judge.  Affirmed.

Law Offices of Ricky W. Poon and Ricky W. Poon for Appellant.

Law Offices of C. Stephanie Chen and Chaoyi Stephanie Chen for Respondent.

Luo Zheng (Luo)[1] appeals a family court's spousal support order following its grant of Jianyi Zhang's (Zhang) petition for nullity of marriage.  Luo contends the family

---

1       Following appellant's practice in her brief, we refer to her by her first name to avoid confusion.

court erred by: (1) failing to award her spousal support under the criteria set forth in Family Code[2] section 4320; (2) "disregarding" the parties' stipulation that Luo be regarded as a putative spouse; (3) failing to rule the disputed residence in Chino Hills, California (Chino Hills property) was Zhang's gift to Luo; (4) failing to apply proper tracing rules to determine the source of funds used to purchase the Chino Hills property; and (5) finding Zhang was entitled to reimbursement under section 2640, in light of Zhang's act of bigamy. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2011, Zhang filed a petition for nullity of marriage based on bigamy. He and Luo were married on December 29, 2010. The parties stipulated that they separated less than two months later, on February 17, 2011. In the petition, Zhang represented that the couple had no children. Zhang claimed the Chino Hills property and other property as his separate property. Luo also filed for nullity of marriage, claiming the Chino Hills property as her separate property. Both parties testified at the hearing through interpreters.

Zhang testified that in 1997, Luo started working as his secretary when he was general manager of a company in Shanghai, China. He claimed that when he started dating Luo in approximately 1998, she knew he was married to Wu Lei, with whom he remained married at the time of the hearing on this matter. He testified that in 2009, he purchased the Chino Hills property for $401,000 with funds he had borrowed from a

_____

[2] All statutory references are to the Family Code unless otherwise stated.

2

friend. Zhang claimed he and seven individuals he enlisted in China wired approximately $49,980 each to Luo's bank account in the United States. Zhang explained: "Because according to the foreign exchange control regulations of China, a Chinese citizen is allowed only to remit to a foreign country one year, $50,000 U.S. dollars in total. That is why all these people were found for that purpose. Of course I, myself, was included." Zhang executed a power of attorney authorizing Luo to buy the Chino Hills property on his behalf. The escrow company's "Buyer's Final Settlement Statement" records Zhang as buyer of the Chino Hills property. A title deed introduced into evidence shows Zhang obtained title to it as a single man on August 19, 2009.

Zhang testified that since Luo immigrated to the United States in March or April 2008, he gave her $1,000 monthly for her living expenses. On December 29, 2010, he and Luo got married in Las Vegas, Nevada. On January 12, 2011, Zhang quitclaimed the Chino Hills property to Zhang and Luo as joint tenants. Zhang filed in the family court an income and expense declaration representing that his monthly income was 3,500 Renminbis (RMB), the Chinese currency. The parties stipulated that as of March 10, 2013, the Chino Hills property was appraised at $370,000.

Luo testified that since 1997, she and Zhang were "involved in a girlfriend-boyfriend relationship. And he started giving me money." She stated Zhang supported her with approximately $1,500 monthly for 13 years. When she moved to the United States in 2008, she opened her separate bank account here. She testified that on her return visit to Shanghai in October 2008, Zhang promised to marry her and buy her a house in California as a marital gift. She explained: "Therefore, to show his sincerity,

3

[Zhang] deposit [*sic*] $50,000 to my personal account . . . and I told him to give the rest of the $350,000 to my father." She added, "First of all, my dad would be a witness to testify that [Zhang] had given me the money as a gift. It is a free gift and voluntarily [*sic*] gift. Number two, my dad could find seven individuals to wire the money to my account." Luo claimed she paid $396,606 for the Chino Hills property with funds from her separate bank account.

Luo testified she initially planned to buy the Chino Hills property in her own name but Zhang opposed, saying that since they were getting married, he wanted his name on the deed: "[H]e was not sure I was going to marry him or not. And now he's given me the money, the house. And I may not marry him. So he was not feeling comfortable doing so. So he decided to have all the documents sent to Shanghai . . . so he could sign his name on the documents."

In support of her argument the Chino Hills property was a gift to her, Luo relies on emails Zhang sent to her referring to it as the "bridal home" and "our house," and declaring himself "ready to welcome my bride." Luo testified she was currently conducting "internet business," and earning between one and two thousand dollars monthly.

In its July 2013 ruling, the court entered a judgment of nullity on the ground Zhang was engaged in a bigamous marriage, and terminated jurisdiction to order spousal support. It acknowledged the parties had stipulated to accord Luo putative spouse status: "Initially, the litigation focused on [Luo's] knowledge of the bigamy and thus her potential status as a putative spouse. However, at trial, counsel stipulated that [Luo]

4

should have putative spouse status."  The court continued:  "A putative spouse is entitled to spousal support in a nullity case, pursuant to [] section 2254. . . .  In spite of the stipulation, it is appropriate to consider the facts underlying [Luo's] situation in this case, in addition to the [section] 4320 permanent support factors, to determine the appropriateness of such an award."[3]

In analyzing the section 4320 factors, the court declined to award spousal support to either party, ruling:  "[] Section 4320 does not help [Luo].  While it is true that Zhang may make a much greater income than [Luo], and have many more assets than she does, the fact remains that this marriage was of [two] months or less in duration.  Mr. Zhang did financially support [Luo] for years; however, this was done voluntarily and under no promise or legal obligation.  When [Zhang] decided to end the relationship, he ended the support, although [Luo] did continue to live rent-free in the Chino Hills home.  [Luo] had already planned to move to the United States and has worked for many years and

---

[3]      The court explained its view regarding Luo's knowledge Zhang was married to Wu Lei:  "The court is sympathetic to [Luo's] situation.  These parties had engaged in a 13[-plus-]year relationship, and Mr. Zhang no doubt did assure [Luo] that he would divorce his wife in China and marry her. . . .  However, when [Luo] married another person knowing that that other person was married to someone else, she assumed the risk that her marriage to that other person would be annulled and she would receive nothing. It would be far different if she had no idea of [Zhang's] other marriage, but such is not the case here.  [¶]  The situation would also be different if [Zhang] promised to marry [Luo] while secretly intending not to do so.  However, the evidence in this case indicates that Mr. Zhang was planning to divorce [Wu Lei] and marry [Luo], but backed out when [Luo] failed to end her relationship with [another man].  [¶]  Therefore the court is reluctant, even before considering the [section] 4320 factors, to award spousal support to someone who knowingly entered into a bigamous marriage."

5

therefore has the skills to support herself. [¶] [Luo] did testify to health problems related to this case, and she stated that the health issues, anxiety, and depression make her unable to support herself. However, while sympathetic, the court simply can find no legal basis to require [Zhang] to continue to support her over two years after separation, with only 60 or less days of marriage prior to that separation, especially in light of her knowledge of the situation she was getting into."

The court's ruling on the division of the community property acknowledged the stipulation: "Both parties agree that, based on [Luo's] putative spouse status, [she] may be entitled to the same share of any community property as if the marriage were valid." The court explained: "The issue of the . . . home in Chino Hills was the driving force behind this litigation. [Zhang] transferred funds from China to [Luo's] American bank account and gave [Luo] power of attorney to allow her to purchase this home in 2009 prior to their wedding. The home was originally in [Zhang's] name as a single man. In January 2011, after the wedding, the home was placed in both parties' names as husband and wife, joint tenants. [Luo] has resided in the home since separation."

The court outlined the parties' opposing views regarding the ownership of the Chino Hills property: "[Luo] attempted to rebut the presumption [that the Chino Hills property was Zhang's separate property based on his originally holding title to it as a single man] by arguing that the home was meant as a gift to her from the very beginning. She testified that she contributed the deposit out of her own money and that all of the $396,600 used to close the deal was money sent by Mr. Zhang to her bank account as a gift to be used to purchase her home. Mr. Zhang had no power of attorney over her funds

6

or her bank account, and therefore the money was hers to use as she saw fit. She also stated that [Zhang] wanted the home as their bridal house and bought it solely for her because she was marrying him. She had originally intended to put the home in her name only, but Mr. Zhang insisted on ownership because he was unsure she would marry him. She agreed to put it in his name because she trusted him. [¶] [Zhang] stated that he bought the home as an investment, as American real estate was in a slump and he felt he could get a good deal. The monies for the home were all paid out of his funds, and he only used [Luo] as an agent because she was actually in the United States and had told him that the escrow company insisted that he give her authority to consummate the transaction. He gave her power of attorney to buy the house for him."

The court made its credibility determination: "The court suspects that the truth lies somewhere in the middle of these positions. It is doubtful that [Zhang] bought this house only as an investment. Clearly, he wanted to marry [Luo] very much, and this house would be a great place for them to share their lives together in California. However, a gift can only be found when there is a clear transfer of property with an intent to do so. In this case, there is no evidence that Mr. Zhang intended to give this home to [Luo], and the title clearly indicates otherwise. The court finds that there is no proof that [Luo] contributed anything to the purchase of the home other than money given to her by [Zhang]. [¶] Consequently, there is no rebuttal to the title presumption at the time of the original purchase, and the home was bought as [Zhang's] separate property."

The court next found "that the transmutation is valid and the Chino Hills residence is quasi-marital property, the equity of which is to be divided equally, as with community

7

property."  The court continued:  "The problem for [Luo] comes when running the numbers.  The community is entitled to the difference between the value at time of the transmutation [$368,000] and the time of separation or trial [$370,000].  Here, that amount is $2,000, and thus [Luo] is entitled to $1,000.  [¶]  However, as [Zhang] argues, under [] Section 2640, he is entitled to reimbursement of all separate property which he contributed, up to the value at time of the quitclaim deed.  Since he paid for the entire home [over $400,000], out of his separate property, the community share must pay him for his contributions.  Obviously, the $1,000 due to [Luo] is eliminated by this reimbursement."

The court denied Luo's claim she was entitled to reimbursement for remodeling and improving the Chino Hills property.  It also denied Zhang's claim for reimbursement for the reasonable rental value of the home for the approximately two and a half years in which Luo occupied it following their separation "[b]ecause [Zhang] is not a putative spouse and because he entered into this marriage knowing he was already married to another woman, the court chooses not to make this award."  The court ordered Luo to quitclaim the Chino Hills property to Zhang.

In ruling on Luo's attorney fees motion, the court relied on the parties' stipulation: "[Luo] requested that [Zhang] pay $50,000 in her attorney fees.  In considering this issue, the court faces a dilemma:  Under [] section 2255, the court may not award attorney's fees to a party to a nullity, such as [Luo], who had knowledge of the other party's existing marriage.  On the other hand, the parties stipulated that she is a putative spouse.  The court concludes it would be unfair to apply [section] 2255 in opposition to a trial

8

stipulation, and therefore finds that she is eligible for an attorney's fees award under [] sections 2030-2032."

The court discussed the parties' respective incomes in the context of Luo's request for attorney fees: "In applying the factors of [sections 2030 thru 2032], the court finds difficulty in determining either party's income. Mr. Zhang claims a modest monthly income from his job . . . but his lifestyle and some of the e[-]mail communications [such as the one indicating he was in a million-dollar club in China], as well as the speculation of [Luo], who worked with him in the company at one point, suggest that his income may be much higher. [Luo] indicates no income, but she also testified that she does some internet sales. Consequently the court does not really know what each party makes. [¶] However, it is clear that [Zhang] makes significantly more than [Luo, who] does not have the ability to pay her attorney[.]" The court ordered Zhang to pay Luo $15,000 in attorney fees.

DISCUSSION

I.

Luo contends the family court erred by failing to evaluate all of the section 4320 factors. She specifically claims the court failed to consider "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage" (§ 4320, subd. (a)); "[t]he marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment"

9

(§ 4320, subd. (a)(2)); and the needs of each party based on the standard of living established during the marriage. Luo adds, "The evidence at trial clearly showed that [she] did not need to go to work because Zhang had provided support to [her] for about $1,500 to $2,000 per month for about 13 years."

In ordering permanent spousal support, " 'the trial court *must* consider and weigh all of the circumstances enumerated in [section 4320], to the extent they are relevant to the case before it. [Citations.] The first of the enumerated circumstances, the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed. [Citations.]' [Citation.] Other relevant statutory factors include the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the duration of the marriage; the age and health of the parties; the balance of hardships to the parties; and the goal that the supported party be self-supporting within a reasonable period of time." (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.) After weighing all those factors, the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475.) "In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord each." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283.)

Luo's contention that the trial court did not consider all of the section 4320 factors is inconsistent with the general principle of appellate practice that we presume that a

10

judgment or order of a lower court is correct.  " 'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see also *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130 ["under [Code of Civil Procedure] section 634, the party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. . . . [I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient . . . and hence the appellate court will imply findings to support the judgment." (*Arceneaux, supra,* at pp. 1133-1134, fn. omitted.)  Luo is correct that the family court agreed to prepare a statement of decision; therefore, Luo was not required to request one.  However, Luo did not request clarification of the statement of decision to address the concerns she now raises.

In any event, as noted, the trial court's order mentioned certain section 4320 factors.  It first acknowledged Zhang earned more and had more assets than Luo, although it candidly admitted it did not exactly know what either Zhang or Luo earned.  Nevertheless, the court emphasized section 4320, subdivision (f), dealing with the duration of the marriage, and reiterated that "this marriage was of [two] months or less in duration."  " 'In short-term marriages the duration of the marriage, considered alone, will usually militate against any but short-term spousal support with a fixed termination date . . . .' [Citation.]  'True, the length of the marriage is only *one* factor to be considered in making a support award. [Citation.]  But it is a substantial one.  It is indicative of the

11

very essence of the union.' " (*Hebbring v. Hebbring (*1989) 207 Cal.App.3d 1260, 1266 [applying section 4320's predecessor statute].)

Applying section 4320, subdivision (a)(1) regarding the "marketable skills of the supported party," the court pointed out Luo had worked for many years and therefore had the skills necessary to support herself. This conclusion is supported by Luo's testimony regarding her internet business, which earned her between one and two thousand dollars in monthly income. The court also emphasized section 4320, subdivision (n), referring to any other factors it determines are "just and equitable." The court found no legal basis to require Zhang to continue supporting Luo two years after separation, in part because she had continued to live rent-free in the Chino Hills home. We conclude the family court's finding on this point is consistent with the legislative policy that the supported spouse should make a good faith effort to become self-supporting. (See section 4320, subd. (l) [even in short-term marriages, a "reasonable period of time" within which to achieve the goal of self-support "generally shall be one-half the length of the marriage"].)

To the extent Luo sought to bolster her claim for spousal support by conflating the standard of living that Zhang helped her maintain in the 13 years before marriage with the standard she enjoyed in the approximately 50 days of marriage, the court did not err by ruling that any consideration of premarriage support was foreclosed under California law. (See *In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143, 149 [concluding that in making a limited support award, the court properly refused to consider parties' lengthy period of premarital cohabitation].)

12

Finally, Luo contends the family court disregarded the parties' stipulation that Luo would be accorded putative spouse status, and instead discussed in its final ruling that Luo knew of Zhang's marriage. We agree that discussion was not necessary to the family court's resolution of the case. "A stipulation is 'An agreement between opposing counsel . . . ordinarily entered into for the purpose of avoiding delay, trouble, or expense in the conduct of the action,' [citation] and serves 'to obviate need for proof or to narrow range of litigable issues' [citation] in a legal proceeding." (*County of Sacramento v. Workers' Comp. Appeals Bd.* (2000) 77 Cal.App.4th 1114, 1118.) However, we point out that on one issue the trial court used the stipulation to benefit Luo, granting her attorney fees when it otherwise would not have been available to her. Moreover, we deem the trial court's statements regarding Luo's knowledge of Zhang's previous marriage to be harmless error and we do not consider them on this appeal. Instead, we rely solely on the other aspects of the court's decision that were sufficiently based on section 4320 factors. We review the family court's ruling, not its reasoning. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)

## II.

Luo contends the trial court committed reversible error by finding that the Chino Hills property was Zhang's separate property, rather than his gift to her. She points to the following factors purportedly showing Zhang's donative intent: "[T]he money used to purchase the Chino Property was transferred to Luo's bank account prior to marriage . . . ; 2) Luo's bank account was an individual bank account and Zhang had no rights to access or control said bank account . . . ; 3) Zhang orally told Luo that the money was a gift to

13

Luo in contemplation of marriage . . . ; 4) Zhang's written e-mails to Luo [were] also evidence the money transferred to Luo was for her to purchase the Chino property and such intention was clearly shown by Zhang's statements and acts such as: a) 'decorate the bridal home;' b) 'it is *our* house;' c) a house 'similar to *ours*;' and d) Zhang's subsequent act by transferring to Luo the title as Husband and Wife, Joint Tenancy."

We review the family court's factual findings for substantial evidence and they "will be upheld 'as long as [the family court's] determination is within the range of the evidence presented.' " (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) We do not reweigh the evidence or make determinations as to credibility. (*Id.* at pp. 204, 205.) "This court views the entire record in the light most favorable to the prevailing party . . . . We must resolve all conflicts in the evidence and draw all reasonable inferences in favor of the findings." (*In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 931.) Luo has failed to demonstrate how the family court erred other than criticizing the court for not crediting her evidence. She thus has failed to carry her burden to show error, given the substantial evidence standard of review we are bound to apply.

The family court rejected Luo's testimony that Zhang gave her the house as a gift, concluding no evidence supported that conclusion. Rather, it believed Zhang's testimony he paid for the Chino Hills property out of his funds, and only gave Luo the power of attorney to use those funds to buy the house for him. Further, Zhang gained title to the property as his separate property, thus he was entitled to the statutory presumption it was his separate property. We do not reweigh the evidence, but are satisfied substantial evidence, in the form of Zhang's testimony and the title deed, support the court's finding.

14

As stated in Evidence Code section 662: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." Evidence Code section 662 codifies the common law " 'form of title' " presumption under which "the description in a deed as to how title is held is presumed to reflect the actual ownership interests in the property." (*In re Marriage of Brooks* (2008) 169 Cal.App.4th 176, 184-185, disapproved on other grounds in *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1495; see *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 292 [summarizing history of Evidence Code section 662].) On appeal, we review the trial court's determination that the Evidence Code section 662 presumption was rebutted for substantial evidence. (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 345.)

We reach the same conclusion on Luo's contention the court erred by ignoring tracing rules regarding the source of funds used to buy the Chino Hills property. Citing no authority, she contends: "Zhang's transfer of the Chino Property to both Luo and Zhang as joint tenants demonstrates that the Property was actually a gift to Luo. . . . It is worth noting that [her] name as on as a joint tenant [on the title deed] does not diminish the inference that the parties intended the Chino property to be [her] separate property." Luo repeats her claim that Zhang gave her a gift by transferring the funds to buy the Chino Hills property to her bank account through several wire transfers. But the family court rejected that claim, finding no evidence Zhang intended to give Luo a gift. The record supports that conclusion.

15

Luo provides us no basis in the record or in law for her claim that "Zhang's transfer of the Chino Property to both Luo and Zhang as joint tenants demonstrates that" the parties "intended the Chino property to be [her] separate property." We therefore reject the contention.

III.

Luo contends the trial court erred by finding Zhang was entitled to reimbursement under section 2640: "[T]here is no California case law or statutory authority to suggest that [] section 2640's reimbursement would apply to Zhang in a nullity of marriage as a result of Zhang's bigamy. [¶] In fact, it is against California's public policy to protect the interest of a foreign citizen who has committed bigamy over a citizen of its own state. Moreover, Zhang clearly has unclean hands but seeks the protection of [] section 2640 for reimbursement of all money from his putative spouse, Luo." Luo adds, "Under a [section] 2640 reimbursement analysis, [she] never agreed in writing to waive her claim to the title of the property. The evidence shows that [she] paid for the entire purchase price from her separate bank account before marriage and as a putative spouse, [she] is entitled to the full reimbursement under [] section 2640."

To the extent Luo now contends section 2640 is inapplicable to this case, the contention is forfeited under the doctrine of invited error. In Luo's trial brief, she argued, she was entitled to "the ownership interest of all community or quasi-community property pursuant to . . . section 2640." She elaborated: "Based upon the clear statutory language of [ ] section 2640, the Court will clearly see that there are triable issues of material fact relating to the Chino Hills Property. These triable issues will be related to

16

the source and character of money used to purchase the Chino Hills property; whether money wired by [Zhang] to [Luo] is a 'gift' and became [Luo's] separate property; whether the source and character of money used for the maintenance of the Chino Hills property after its purchase (property tax, maintenance, household expenses, etc.) came from [Luo] or [Zhang's] separate property; whether [Luo] is entitled to one[-]half the Chino Hills Property because of [Zhang's] quitclaim to [Luo] as a 'Joint Tenancy'; whether [Zhang] did make a contribution to the Chino Hills Property; and whether [Luo] is entitled to the Chino Hills property under the putative spouse doctrine."  Luo's counsel made the same arguments in closing arguments at the hearing.  (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [doctrine of invited error rests on the principle that " '[w]here a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal"].)

In any event, the court did not err by relying on section 2640 to trace the parties' contributions to acquisition of the Chino Hills property, which it deemed as quasi-marital property:  "Both parties agree that, based on [Luo's] putative spouse status, [she] may be entitled to the same share of any community property as if the marriage were valid."

Section 2640, subdivision (b) provides:  "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement . . . , the party shall be reimbursed for the party's contributions to the acquisition of the property of the community property estate to the extent the party traces the contributions to a separate property source."  "The amount of reimbursement recoverable is the value of the separate property contributions at the time they were

17

made." (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057.) "Commingling of separate and community property does not alter the status of the separate property interest so long as it can be traced to its separate property source." (*Ibid.*) "Whether the spouse claiming a separate property interest has adequately met his or her burden of tracing to a separate property source is a question of fact and the trial court's holding on the matter must be upheld if supported by substantial evidence." (*Id.* at pp. 1057-1058.)

"Apparently, the Legislature concluded it was fairer to the contributing spouse to permit reimbursement for separate property contributions upon dissolution of the marriage. [Citation.] Thus, under section [2640], 'the tables are turned so that the separate property interest is now *preserved* unless the right to reimbursement is waived in writing.' " (*In re Marriage of Perkal* (1988) 203 Cal.App.3d 1198, 1201-1202 (*Perkal* ) [discussing predecessor statute to Family Code section 2640, former Civil Code section 4800.2].) To establish a waiver of the right of reimbursement, a spouse must demonstrate that the other spouse actually intended to relinquish the right to reimbursement or acted " 'so inconsistent with the intent to enforce th[e] right in question as to induce a reasonable belief that it has been relinquished.' " (*Perkal, supra,* 203 Cal.App.3d at p. 1203.)

Quasi-marital property is "property acquired during the union which would have been community property or quasi-community property if the union had not been void or voidable." (§ 2251, subd. (a)(2); see *Estate of Leslie* (1984) 37 Cal.3d 186, 191, fn. 5; *Estate of Hafner* (1986) 184 Cal.App.3d 1371, 1384, fn. 12.) "The theory of 'quasi-marital property' equates property rights acquired during a putative marriage with

18

community property rights acquired during a legal marriage."  (*Estate of Vargas* (1974) 36 Cal.App.3d 714, 717.)

Upon declaration of putative spouse status, the court is required to divide the quasi-marital property as if it were community property.  (§ 2251, subd. (a)(2); *Marvin v. Marvin* (1976) 18 Cal.3d 660, 678, fn. 13.)  Thus, "the share to which the putative spouse is entitled is the same share of the quasi-marital property as the spouse would receive as an actual and legal spouse if there had been a valid marriage, i.e., it shall be divided equally between the parties."  (*Estate of Hafner, supra,* 184 Cal.App.3d at p. 1384; see § 2550.)

Here, the court concluded Luo was a putative spouse and it complied with the statutory requirements of treating the Chino Hills property as community property.  There is no evidence in the record that Zhang waived his right to reimbursement of his separate property used to buy the Chino Hills property.

DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.


_____
O'ROURKE, J.

WE CONCUR:


_____
HUFFMAN, Acting P. J.


_____
McINTYRE, J.