Filed 1/28/25  Marriage of Kuperschmit and Jones CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of INES KUPERSCHMIT and DEREK JONES. | B324380 <br><br> (Los Angeles County Super. Ct. No. 18STFL06653) |
| INES KUPERSCHMIT, <br><br> Respondent, <br><br> v. <br><br> DEREK JONES, <br><br> Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne K. Richardson and Amy M. Pellman, Judges.  Affirmed.

Derek Jones, in pro. per., for Appellant.

No appearance by Respondent.

Appellant Derek Jones (Jones) and respondent Ines Kuperschmit (Kuperschmit), who share four children, separated in 2018 after almost 16 years of marriage. Kuperschmit petitioned for dissolution, spousal support, and determination of the parties' property rights. The judgment, entered in August 2022 after five days of trial proceedings, resolved many disputed factual issues. Jones appeals from the judgment, and we consider, in the main, whether the trial court erred in declining to retroactively modify an interim child and spousal support order, in ordering Jones to reimburse Kuperschmit for three breaches of fiduciary duty, and by curtailing joint legal custody over the children in certain respects.

## I. BACKGROUND

A. *The Petition for Dissolution and Stipulated Interim Order*

Kuperschmit and Jones were married in September 2002.[1] They share four children, L.J, E.J., S.J., and I.J., who were born between 2008 and 2014.

In May 2018, Kuperschmit filed a petition for dissolution of marriage, citing irreconcilable differences. Kuperschmit requested joint legal and physical custody of the children and spousal support. She also asked the court to confirm certain property as separate, to determine the parties' rights to community and quasi-community assets and debts, and to order Jones to pay Kuperschmit's attorney's fees and costs.

---

[1] Kuperschmit and Jones are both attorneys, but Jones at some point was involuntarily placed on inactive status with the State Bar in connection with allegations of financial impropriety.

Two months later, Kuperschmit filed a request for a domestic violence restraining order. Jones filed his own petition for dissolution of marriage shortly thereafter. He agreed to joint legal custody of the children, but he requested sole physical custody of the children with visitation for Kuperschmit.

In September 2018, Jones and Kuperschmit stipulated to an interim parenting schedule and temporary support award, which was later entered as an order of the court. Pursuant to the parties' agreement, they would share interim joint legal and physical custody of the children (with physical custody governed by a set schedule). The stipulation further provided Jones would pay "temporary child support" to Kuperschmit in the amount of $1,582 per month and "temporary spousal support" in the amount of $1,187 per month. Both amounts were "without prejudice to either party and subject to retroactive adjustment" to dates in August and September 2018. In addition, the stipulation stated the temporary child support and temporary spousal support amounts were based on "[Jones's] representation that his current income consists of wages and salary in the amount of $20,000 per month and [Kuperschmit's] representation that her current income consists of wages and salary in the amount of $10,000 per month."[2]

As part of the stipulation, Kuperschmit agreed to dismiss her request for a domestic violence restraining order and the parties agreed to various restrictions on Jones's actions and proximity to Kuperschmit. The parties agreed to reserve the

---

[2] Jones also agreed to pay the cost of I.J.'s preschool tuition for the 2018-2019 school year.

issue of attorney's fees and agreed the court would retain jurisdiction over the issue.

In February 2019, the court granted Kuperschmit's request for bifurcation and termination of marital status and entered a status judgment.

### B. Kuperschmit Requests Legal Custody as to Educational Issues

In June 2019, Kuperschmit filed a request for an order directing that the children attend schools in the South Pasadena Unified School District or, in the alternative, giving her ultimate decision-making authority on issues concerning the children's education. In support of her request, she filed a declaration asserting the children had previously been attending private school, the family could no longer afford private school, Jones had been stymieing her attempts to enroll the children in highly ranked public schools for years, and she had secured housing in South Pasadena and enrolled all four children in highly-rated public schools in that school district.[3]

Jones opposed Kuperschmit's request for order. His declaration in support of his opposition asserted he had secured admission for one of the children to West Hollywood Elementary via the LAUSD open enrollment process and the other children

---

[3] Kuperschmit also asserted Jones had agreed to pay all the tuition costs associated with private school in August 2018, but by that winter, the school had informed them the children's enrollment would be terminated due to non-payment of tuition. The school ultimately permitted the children to remain through the end of the school year.

4

would be given an open enrollment transfer. Jones also asserted Kuperschmit had become a partner at a law firm in November 2018, and based on information and belief, her salary had doubled. Jones additionally represented he intended to file a request for order to revisit support, but no request was later filed.

The trial court held a hearing on Kuperschmit's educational issues request for order in October 2019. The court ruled it would give tie-breaking authority over educational decisions, including school choice, to Kuperschmit. The court ordered the parties to meet and confer prior to making any future educational decisions. The court also specified the parties would otherwise continue to share joint legal custody.

### C.     Other Requests for Orders

In October 2020, Jones filed an ex parte request to, among other things, change his child and spousal support obligations. The trial court denied the request for lack of exigent circumstances, stating the request could be filed as a regular noticed motion.

In February 2021, Kuperschmit filed a request for order asking for temporary emergency orders ceasing in-person visitation by Jones after the United States Attorney's Office for the Southern District of New York issued a press release stating Jones had been indicted and arrested on charges of wire fraud and aggravated identity theft.[4] The court set the matter for a noticed hearing, which took place in April.

---

[4]     In November 2021, Jones pled guilty to a single count of wire fraud in the federal prosecution. He had not yet been sentenced at the time of the later trial in this family law matter. After the conclusion of that trial, which we discuss *post*, Jones

At the hearing, the court found there was no immediate risk of Jones being searched, seized, or detained; the court ordered, however, that if Jones were detained on the criminal charges, Kuperschmit would immediately be awarded sole physical custody. The court set a trial setting conference for August and ordered the parties to file and serve updated income and expense declarations. Kuperschmit asserted at the hearing that she intended to seek redress for Jones's asserted breach of the spousal support agreement. Jones argued no support orders had been made, but the court clarified the earlier stipulated temporary spousal support order was still in effect.

Kuperschmit filed an income and expense declaration in July 2021 asserting she made $18,333 per month. She also asserted Jones had only paid her $3,955 in support since August 2018. Jones filed an income and expense declaration in September 2021 claiming income of $8,000 per month.

The appellate record does not contain a transcript, minute order, or other document describing the events that transpired at the trial setting conference in August 2021.[5] Though the register of actions reflects Kuperschmit filed a trial brief on January 21, 2022, the record does not contain a copy of her trial brief either. (There is no indication Jones filed a trial brief.)

---

filed a declaration stating he intended to file a motion to withdraw his guilty plea.

[5] Jones's notice of designation of record did not request a reporter's transcript of the August 2021 trial setting conference or the minute order from the hearing.

6

*D.     Trial*

The court held a bench trial over a series of days in January, February, and May 2022.  Kuperschmit and Jones, who were representing themselves, testified and presented documentary evidence.  The record on appeal includes the reporter's transcript of the trial, but Jones did not arrange for transmission of any of the trial exhibits to this court.  (Cal. Rules of Court, rules 8.122(b)(3), 8.224(a).)  We summarize below only the facts pertinent to the arguments Jones asserts on appeal.

*1.     Child and spousal support issues*

Kuperschmit asked the court to enforce the 2018 stipulated interim child and spousal support order by directing Jones to pay accrued, unpaid child and spousal support retroactive to August 2018.  Kuperschmit did not ask the court to order child or spousal support on a going-forward basis.  Jones initially asked the court to modify the amount of support he owed retroactive to November 2018 (when he contended Kuperschmit's income increased and his went "the other direction, unfortunately").  When later asked whether he was seeking an order that Kuperschmit pay spousal support to him on a going-forward basis, Jones stated that would depend on how all of the various issues before the court were resolved.

The evidence at trial established Jones paid Kuperschmit $1,582 in support in August 2018 and $2,373 in support in October 2018.  Kuperschmit did not receive any other payments pursuant to the September 2018 stipulation and order.  According to Kuperschmit's calculations, the accrued, unpaid child and spousal support retroactive to August 2018 totaled $112,343 plus interest.

Jones conceded during trial that he never filed a noticed request for order to modify the earlier child and spousal support order. He testified he believed he did not have to because the interim order conditioned support on the parties' representations as to the circumstances that existed at the time and the parties had an obligation to notify one another when the representations became invalid. Jones believed Kuperschmit began earning $18,000 per month in November 2018 (when she accepted her new job), but he presented no evidence establishing her income at that time (as opposed to the time of Kuperschmit's later revised income and expense declaration in July 2021).[6]

### 2. *Educational issues*

Following the court's 2019 order giving Kuperschmit tie-breaking authority over educational decisions, the children attended elementary schools in the South Pasadena Unified School District. They were doing well in their schools.

Testimony during trial established that Jones, a month before trial began, submitted applications on behalf of the two oldest children (L.J. and E.J.) to attend a private school in Pasadena that charges around $35,000 per year for tuition. Jones said one of the children had expressed an interest in a more academically rigorous school. Jones asserted financial aid was available for qualifying families and he believed he could afford $5,000 toward tuition every year. Kuperschmit did not authorize Jones to apply to the school, and Jones did not talk to Kuperschmit about applying to the school before he did so. Jones

---

[6]     Jones did not propound discovery before trial.

testified he told Kuperschmit he submitted the applications on the day he submitted them, which was before essays or assessments of the children were required to be submitted.[7]

Jones asserted the order providing Kuperschmit with tie-breaking authority gave his children the impression that he had no say in educational matters and Kuperschmit had effectively been given unilateral discretion over the issue. He stated this was problematic "because there is . . . naturally a geographic component" (i.e., the schools they attend would inform where they live) and suggested the court appoint a third party who could be consulted in the event of disagreement between the parents.

### 3. *Financial issues*

Jones was in charge of the family's finances during the marriage, and the parties testified regarding a number of problems related to those finances that arose.

### a. *529 accounts*

Jones's former employer and business partner opened 529 educational accounts for L.J. and E.J. Kuperschmit had not seen any information pertinent to those accounts. Jones had no idea if there was still any money in the accounts, denied ever having access to the funds, and denied diverting any funds from the accounts.

---

[7] Jones had also previously submitted an application for one of the children to a different private school, and told that child he had been accepted. Kuperschmit contacted the school and was told the application had not been completed.

### b.    *lost IRA investment*

In 2010, Jones transferred money out of a joint bank account and into an account Kuperschmit did not recognize. The same year, Jones encouraged Kuperschmit to transfer an IRA retirement account in the amount of $13,000 to him, representing that if she did so he would invest the funds in an investment called Alamar Ranch. Kuperschmit agreed and the funds were transferred to Jones as the financial advisor. Kuperschmit had no proof that Jones ever purchased Alamar Ranch, she never received any financial statement informing her of what her investment in the property was, and she had not seen the $13,000 since transferring it to Jones. According to Jones, they had been "pushed out" of a real estate deal and lost money; he conceded he never gave Kuperschmit an accounting of what happened to the money, however.[8]

### c.    *company lawsuit*

In September 2012, Jones left his job at a company named Legado. Legado later sued Jones for fraud and negligence, and named Kuperschmit as a defendant too. Kuperschmit testified she was not personally served and was not aware of the lawsuit until an attorney contacted her to prepare her for a deposition.

---

[8]    Kuperschmit testified another investor in Alamar Ranch filed a lawsuit against Jones in connection with the investment loss and named Kuperschmit as an additional defendant. Kuperschmit was not personally served with the investor's complaint; Jones accepted service on her behalf and she did not learn about the lawsuit until her default was about to be entered.

When she learned she was a defendant in the case, Kuperschmit told the attorney she believed there was a conflict of interest preventing him from representing both her and Jones. The attorney asserted she had already signed a conflict waiver, but Kuperschmit had not done so.

### d.    jewelry

At some point during the marriage, Kuperschmit's engagement ring and wedding bracelet went missing. Jones told her their child, S.J., who was a toddler at the time, was likely responsible. He later told her he was taking the items to a jeweler to be cleaned. Kuperschmit subsequently discovered a receipt for a pawn broker that indicated Jones had pawned her ring, bracelet, and other items.

### e.    family home and trust

Jones and Kuperschmit purchased a family home in 2002. Kuperschmit provided the $40,000 down payment from her own separate property.

In late 2014 or early 2015, Jones and Kuperschmit signed a grant deed transferring the property to the "Lomigosa Irrevocable Trust," which was intended to benefit their children.[9] Around the same time, Jones took out loans using the property as collateral without Kuperschmit's knowledge or approval. Jones testified he and Kuperschmit took out a $500,000 loan against the property in 2015, the proceeds of which went to paying off liabilities from lawsuits and to pay community expenses. When the loan

---

[9]    The record does not include the trust document.

11

matured in 2016, the lender foreclosed on the property. Though Jones knew about the foreclosure, he did not tell Kuperschmit; instead, Kuperschmit learned they lost the home when she encountered a gardener on the property who told her he had been hired by the new owner.

Jones later filed a lawsuit related to the foreclosure. Kuperschmit attempted to settle the matter, but Jones refused to accept a settlement agreement that would have awarded Kuperschmit $50,000. The lawsuit was still pending at the time of the trial.

*f.      tax deficiency and credit card*

In or around 2017, Kuperschmit received a tax withholding notice from the Franchise Tax Board regarding a failure to pay 2015, 2016, and 2017 taxes. Jones was responsible for filing and paying the taxes, and he represented to her each year that he did so. As a result of the failure to pay, Kuperschmit's wages were garnished in the amount of $5,786.32. Jones testified he did not have any reason to think the garnishment was the result of failure to file California income taxes for those years.

Late in the marriage, Kuperschmit closed all credit cards in her name and all joint credit cards she had control over. She subsequently received a notice about an outstanding balance on a Citibank credit card she was not aware existed. Jones testified he had not opened any credit card account without Kuperschmit's authorization.

12

### E. The Trial Court's Judgment and Statement of Decision

After trial, the trial court issued a 66-page statement of decision with extensive findings of fact and discussion of the issues presented for resolution. We summarize the court's rulings and rationale as relevant to the issues raised on appeal.

The court awarded Jones and Kuperschmit joint physical custody of the children on terms set forth in a court-established schedule. The court maintained the order for joint legal custody with three exceptions: (1) Kuperschmit retained tie-breaking authority as to educational issues; (2) Kuperschmit was granted sole legal custody as it related to financial issues regarding the children; and (3) Kuperschmit was granted sole legal custody (and sole physical custody) in the event Jones was incarcerated.[10]

The court maintained the prior 2019 order giving Kuperschmit tie-breaking authority on educational decisions and rejected Jones's request to appoint a third-party co-parenting coordinator. The court explained Jones had not addressed the problems that led to the prior order and identified new issues arising after the 2019 order that gave the court continued

---

[10] In giving Kuperschmit sole legal and physical custody in the event Jones were to be incarcerated, the court expressly declined Jones's request to maintain joint legal custody during incarceration. The court said it was unknown how easy or difficult it would be to communicate with Jones if he were to be incarcerated. Given that Jones and Kuperschmit have a history of not always being able to effectively and timely communicate, the court was concerned that maintaining joint legal custody during any term of incarceration would only lead to conflict and delay, which would not be in the children's best interest.

concern the parties should not revert to joint legal custody on education issues: Jones unilaterally prepared applications to private schools on behalf of the two oldest children, spoke to the children about the applications before Kuperschmit, and only told Kuperschmit about the applications the day he submitted them. The court also reasoned Jones had not shown any of the educational decisions made by Kuperschmit were not good for the children or contrary to their best interests; instead, Jones complained the children perceived him to have less of a say in educational matters, which was not a basis for the court to grant joint legal custody because the court was focused on what is best for the children, not what is best for the parents. The court further found Jones had not shown a capacity to acknowledge the reality of the family's financial situation, which had a de-stabilizing effect on the children's school attendance.

Regarding its order giving Kuperschmit sole legal custody over financial issues relating to the children, the court explained the order was warranted because Jones had been involuntarily designated inactive in the State Bar and recommended for disbarment based on findings that he breached his fiduciary duty, misappropriated client funds, and made misrepresentations. The court also found it significant that Jones had not denied that he was indicted and pled guilty to one count of federal wire fraud related to a fraudulent investment scheme. The court further found, even apart from Jones's State Bar status and fraud conviction, that Kuperschmit's testimony concerning the other financial misdeeds during the marriage—testimony the court found credible—warranted the order for sole legal custody concerning financial issues.

14

On child and spousal support, the court found Jones did not rebut the amounts Kuperschmit proffered regarding the outstanding sums owed based on the prior temporary support order.  Instead, Jones asked the court to make an adjustment back to November 2018 based on each party's actual earnings. The court believed it may not have jurisdiction to make such an adjustment, but even assuming it did because of the reference to the possibility of retroactive adjustment in the earlier support order, the court found no adjustment was warranted on the facts. Specifically, the court faulted Jones for not timely providing notice to Kuperschmit of what amounts he claimed had actually been earned by both of them and what amount of child and spousal support he believed should be ordered either retroactively or prospectively.[11]  The court accordingly adopted the arrearage amounts set forth in Kuperschmit's trial brief: $62,489 in child support and $49,854 in spousal support, plus 10% interest accruing as of the date of the entry of judgment. The court did not order any amount of child or spousal support going forward, but it ordered the parties to split certain expenses for the children.

Regarding loans on the family home, the court found Jones recklessly engaged in conduct that led to the loss of the home, namely, agreeing to risky loans to pay off other debts,

---

[11]     Jones did not file a trial brief, nor did he file an Income and Expense Declaration until after the first day of trial.  He did not present specific evidence of what he thought the amounts awarded should be, and thus failed to present evidence from which the court could base a modification of the child and spousal support order.

transmuting the house into his name alone (as co-trustee with lenders), and engaging in a risky scheme with lenders that led to foreclosure. The court also found Jones refused a settlement of the lawsuit from the subsequent purchasers, which Kuperschmit wanted to accept. To redress the fiduciary duty Jones violated, the court ordered Jones to repay Kuperschmit $40,000 (the amount of the separate property interest she put into the house). The court also reserved jurisdiction to divide any potential proceeds from Jones's litigation against the lenders.

Finally, the trial court granted Kuperschmit's request to be reimbursed for her $13,000 IRA. The court found she gave the funds to Jones for an investment, Jones never gave her an accounting for the money, and Jones confirmed it was lost in the bad investment into Alamar Ranch, which they never actually acquired. The court also granted Kuperschmit's request for reimbursement of $5,786.32 that was garnished from her wages by the California Franchise Tax Board due to Jones's failure to file California income taxes for the community.

## II.  DISCUSSION

Jones presents four arguments for reversal and all lack merit. First, contrary to Jones's contention, the trial court did not have authority to retroactively amend or eliminate at trial the support order entered earlier in 2018. Second, Jones's complaint that Kuperschmit did not formally plead the fiduciary duty claims and requests for certain modifications of the legal custody order does not warrant reversal because, even assuming error, Jones did not object on those grounds below and he demonstrates no prejudice from the assumed error. Third, Jones's selective reading of the statutes regarding spousal

16

fiduciary duties does not establish the trial court erred in determining Jones violated his fiduciary duty to Kuperschmit on three occasions.  Jones has forfeited any challenges to the sufficiency of the evidence of each violation by failing to fairly describe the evidence presented in his brief to this court.  Finally, Jones's selective reading of statutes regarding joint custody and his complaints regarding the trial court's custody order do not establish the trial court abused its discretion in carving out the exceptions to joint legal custody that it did (regarding educational decisions and financial issues).

> A.     *The Trial Court Did Not Err in Denying Jones's Request to Retroactively Modify the Support Orders*

During the pendency of a dissolution proceeding, a trial court has jurisdiction to order child and spousal support.  (Fam. Code,[12] § 3600.)  Section 3603 states such an order may be "modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate."  Section 3653 similarly provides (with exceptions not relevant here) that "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any *subsequent* date . . . ."  (§ 3653, subd. (a), italics added; see also §§ 3651, subd. (c)(1) ["a support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate"], 3650

---

[12]     Undesignated statutory references that follow are to the Family Code.

17

[defining "support order" to mean "a child, family, or spousal support order"].)  More generally, section 3692 provides that "[n]otwithstanding any other provision of this article, or any other law, a support order may not be set aside simply because the court finds that it was inequitable when made, nor simply because subsequent circumstances caused the support ordered to become excessive or inadequate."  (§ 3692.)

"By their plain terms, these statutory provisions 'permit[ ] the trial court to make its ruling retroactive to the filing date of the motion, but no earlier.'  [Citation.]"  (*Stover v. Bruntz* (2017) 12 Cal.App.5th 19, 26.)  They "divest the trial court of "'discretion to absolve an obligor of support arrearages, or interest thereon.'" [Citations.]"  (*S.C. v. G.S.* (2019) 38 Cal.App.5th 591, 599.)  "A court order modifying support retroactive to any time period *before* the filing date of a modification motion would thus violate the governing statutory scheme.  Such an act, moreover, would be in excess of the court's jurisdiction."  (*Stover, supra*, 12 Cal.App.5th at 26.)  Importantly, the court in *Stover* reached this conclusion even though the parties in that case stipulated any motion to modify support for childcare costs would be retroactive to the date the child was no longer enrolled in childcare.  (*Id.* at 24, 26-27.)

The result and rationale in *Stover* apply equally here. Jones never filed a noticed request for an order revising or terminating either the child or spousal support awards.  The only request he filed seeking that relief was an ex parte request in October 2020, which the trial court denied without prejudice for lack of exigent circumstances—stating the request could be filed as a regular noticed request for order.  Thus, even if the trial court had agreed with Jones's factual contentions (that

18

Kuperschmit's income changed when she acquired a new job, such that she should have ceased receiving support) there was no date prior to trial to which the trial court could retroactively modify support. Jones never filed a noticed motion or request for order.

Moreover, even assuming for argument's sake that the trial court did have jurisdiction to modify the earlier support award, the trial court still did not abuse its discretion (*In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575) when determining a modification was not warranted in light of Jones's noncompliance with rules and court orders regarding the filing of a pre-trial Income and Expense declaration. California Rules of Court, rule 5.260 (Rule 5.260) states that "for all hearings involving child, spousal, or domestic partner support, both parties must complete, file, and serve a current *Income and Expense Declaration . . .* on all parties." (Rule 5.260(a).) Rule 5.260(a)(3) specifies that "[c]urrent" means the form had "been completed within the past three months providing no facts have changed." Jones filed an Income and Expense Declaration on September 3, 2021, more than three months before the trial. The trial court found the declaration he filed at the end of the first day of trial on January 31, 2022, was untimely based on its prior order that all pre-trial documents were to be filed no later than January 22, 2022.[13]

---

[13] This also means Kuperschmit's Income and Expense Declaration, filed July 30, 2021, did not comply with the rules. However, since Kuperschmit was only asking for enforcement of a prior order, and not modification or support on a going-forward basis, the lack of a current declaration did not impact any requests she made of the trial court.

19

Jones's Income and Expense Declarations were also incomplete as they did not attach the two weeks of paystubs that the form directs parties to attach. The trial court reasonably determined that the late, unsupported Income and Expense Declaration provided an insufficient basis to modify the support orders.

None of Jones's remaining arguments on this issue are persuasive either. His contention that the trial court made erroneous rulings on the first day of trial, which precluded meaningful consideration of his position, is unpersuasive. We review the trial court's rulings reflected in its statement of decision, and that statement indicates the trial court indeed considered Jones's position—it just determined that position lacked merit. Jones's argument that the trial court should not have denied his request for failure to provide evidence because he filed Income and Expense declarations over the course of the litigation misses the point. The problem with his filings is that they were incomplete and either not current or untimely, not that they were entirely absent from the record.

Relying on the "legislative intent" of sections 4007 and 4334, Jones additionally suggests Kuperschmit violated a legal obligation by not affirmatively updating the court when she secured a new job. Sections 4007 and 4334 both state that "if" a court orders support for a contingent period of time or until the occurrence of a given event, the obligation terminates upon the occurrence of the contingency; the sections also provide that the court "may" order the person who is receiving the payments to notify the person making the payment upon the happening of the contingency. (§§ 4007, subd. (a), 4334, subd. (a).) Sections 4007 and 4334 are inapplicable here. The stipulation the parties reached did not provide for automatic termination or modification

20

of support upon the happening of any occurrence, nor did it require Kuperschmit to notify Jones if her income changed. Furthermore, though Jones complains at length that Kuperschmit did not formally notify him or the court of any change in financial circumstances, the record reflects Jones was aware Kuperschmit apparently secured a new job by July 2019 at the latest. Jones could have filed a noticed request for order at that time, but he did not.

### B. Fiduciary Duty and Custody Issues
#### 1. The trial court did not lack jurisdiction over these issues

Jones argues the trial court lacked jurisdiction to adjudicate Kuperschmit's breach of fiduciary duty claims and her requests for sole legal custody over certain issues because those claims were not identified in a pleading. We need not decide whether Jones is correct that it was error for the court to rule on those requests when Kuperschmit had not formally pled them because, even if it was, reversal is only warranted if Jones was prejudiced by the error. (Cal. Const., art. VI, § 13; *In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 526-528.)

Accepting, for purposes of analysis, Jones's representation that Kuperschmit identified the aforementioned fiduciary duty and legal custody issues for the first time in her trial brief (a document that is not in the appellate record), it is still the case that Jones received notice of the claims by January 21, 2022, approximately ten days before the first day of trial. The trial took place over five dates in January, February, and May 2022. Jones provided the bulk of his testimony during the May trial

21

dates.  The trial court's statement of decision was not finalized until August 2022.

The nonconsecutive trial dates meant Jones had ample notice of Kuperschmit's claims and ample opportunity to make contrary evidentiary showings.  Jones also had the opportunity to object to these claims on the ground that they were not pled in the trial court.  But so far as the record reveals, he never did.  (If he had, the trial court could have addressed the concern by amending the pleadings, if necessary.  (Code Civ. Proc., § 576.))  The record also demonstrates Jones made no attempt to argue he was prejudiced by the omission below, and Jones makes no prejudice argument in this court either.  Reversal is accordingly unwarranted.

> 2.    *Jones has not shown the trial court erred in ordering him to reimburse Kuperschmit for his breaches of fiduciary duty*

"The existence and scope of a fiduciary duty is a question of law that we review de novo.  [Citation.]  However, 'the factual background against which we [answer that question] is a function of a particular case's procedural posture.'  [Citation.]  Thus, to the extent the court's decision below 'turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard.  [Citation.]'  [Citation.]  Where there is a fiduciary duty, breach of the duty is a question of fact.  [Citation.]  We review the trier of fact's finding a breach occurred for substantial evidence, resolving all conflicts and drawing all reasonable inferences in

22

favor of the decision. [Citation.]" (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144.)

The Family Code provides that spouses "shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships . . . ." (§ 1100, subd. (e); see also §§ 721, subd. (b) [spouses engaging in transactions with one another "are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other"], 1101 ["A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate"].) Jones therefore unquestionably owed fiduciary duties to Kuperschmit.

Jones does not dispute this. Instead, he takes issue with the trial court's application of the pertinent statutes to the facts. He claims the three fiduciary breaches at issue (loss of the family home, the lost investment of the $13,000 IRA, and the failure to pay taxes to the Franchise Tax Board) are not within the scope of section 721 because they "prominently involve third-parties." Even if it is true that third-parties were prominently involved, that still does not mean the transactions do not qualify as transactions between spouses. Nor does Jones demonstrate the breaches do not fall within the ambit of other statutes imposing fiduciary duties on spouses, such as section 1100, subdivision (e), which requires spouses to act in accordance "with the general rules governing fiduciary relationships" "in the management and

23

control of the community assets and liabilities."[14] (See generally *In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 934 [a fiduciary must ""'act with the utmost good faith for the benefit of the other party"'" and ""'can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent"'"].)

Jones also argues the trial court erred in applying section 1101, subdivision (a) to the loss of the property used as the family home because he believes the "community estate" had no interest in the property subsequent to its transfer to the Lomigosa Irrevocable Trust. This is, at heart, an argument that substantial evidence does not support a finding either that the pertinent breach of fiduciary duty was the transfer of the property to the trust itself (to facilitate using the property as collateral without Kuperschmit's knowledge) or that the community estate retained an interest in the property when Jones engaged in the relevant conduct.

---

[14] Jones argues the tax deficiency does not involve "any asset undisclosed or transferred" and thus could not trigger sections 1101, subdivisions (g) or (h). Jones relies on isolated snippets of the subdivisions which, when read in their full context, provide that "*[r]emedies* for the breach of the fiduciary duty by one spouse . . . *shall include, but not be limited to*, an award to the other spouse" of certain percentages or their equal "of any asset undisclosed or transferred in breach of the fiduciary duty." (§ 1101, subds. (g)-(h), italics added.) Contrary to Jones's implication, the statute does not limit the situations in which a spouse may obtain a remedy for breach of fiduciary duty to those circumstances in which an asset has been undisclosed or transferred.

24

"In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment.'" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.) The appellant is also responsible for "support[ing] claims of error with meaningful argument and citation to authority." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) An appellate court is "not required to examine undeveloped claims or to supply arguments for the litigants." (*Ibid.*) The same standards apply whether a litigant is in propria persona or is represented by counsel. (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.)

Jones's brief in this court does not satisfy his duty to fairly summarize all the evidence bearing on whether there was a breach of fiduciary duty in connection with his use of the property as collateral for loan obligations he assumed.[15] The brief includes only a very brief description of the facts regarding the loss of the family home, and it provides no discussion of the evidence favorable to Kuperschmit. We therefore deem the point waived. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

---

[15] Insofar as Jones contends there is no support for an implied finding that the community estate retained an interest in the property after the transfer to the trust, the record is also inadequate to affirmatively show error. Jones, as the appellant, did not make the trust document part of the record before this court.

### 3. *Jones has not demonstrated the trial court erred in issuing its custody orders*

When making an initial permanent custody order, trial courts have the "widest discretion to choose a parenting plan that is in the best interest of the child." (§ 3040, subd. (e).) We must uphold a court's custody order if it can be "reasonably concluded that the order . . . advance[s] the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) We review custody and visitation orders for an abuse of discretion. (*Ibid.*; see also *Rosenthal v. Rosenthal* (1961) 197 Cal.App.2d 289, 311.)

Jones argues the trial court ignored relevant statutes in its legal custody orders—specifically, certain portions of sections 3080 and 3083. His arguments misconstrue those statutes.

Jones cites section 3080 for the proposition that there is a presumption that joint custody is in the best interests of a minor. In doing so, Jones selectively excises words from the statute in a manner that changes its meaning. Section 3080 provides that, "[t]here is a presumption . . . that joint custody is in the best interest of a minor child . . . where the parents have agreed to joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child." (§ 3080.) On the matters in dispute in this case—educational issues, financial issues, and Jones's potential term of incarceration— there was no agreement to joint custody and the presumption articulated by section 3080 does not apply.

Section 3083, which Jones also cites, provides that when making an order for joint legal custody, a court is to "specify the circumstances under which the consent of both parents is required to be obtained in order to exercise legal control of the child and the consequences of the failure to obtain mutual

26

consent.  In all other circumstances, either parent acting alone may exercise legal control of the child."  (§ 3083.)  Jones argues that by carving topics out of the joint legal custody order, the trial court "essentially inverted the applicable statutory framework." The problem with this argument is the trial court effectively granted Kuperschmit sole legal custody on the topics so excised such that the statutory specifications pertinent to joint legal custody do not apply.  And as to joint legal custody over educational issues in particular, nothing in section 3083 prevents a trial court from granting one parent "tie-breaking authority."

Jones additionally argues the trial court did not articulate why the best interests of the children required modification of the interim joint legal custody order.  Though the trial court did not set forth a formal analysis of the children's best interests, it did articulate the reasoning behind its legal custody orders and referenced the children's best interests in doing so.  Jones also asserts the trial court's order is particularly "far afield" from the notion of the "best interest of the children" with respect to termination of legal custody in the event of his incarceration.  In making that order, however, the trial court found it would not be in the best interests of the children for the parties to share legal custody if Jones were incarcerated due to the couple's history of not being able to effectively and timely communicate about issues and the court's concern that joint legal custody in that circumstance would lead to conflict and delay.  Though Jones claims this rests on speculation regarding the circumstances of any future incarceration, it also rests on his and Kuperschmit's prior course of dealing.  Considering, as we must, all of the evidence viewed most favorably in support of the trial court's

27

ruling, there was a reasonable basis for terminating joint legal custody during any period of Jones's incarceration.

Finally, Jones argues the trial court's legal custody orders are infected by consideration of "impermissible character evidence." The argument, even on its own terms, is meritless. Evidence Code section 1100 permits "'. . . evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such person[']s conduct . . .' when the parent's character is the central issue. [And e]stablished law has recognized that the character of a parent is at issue in child's custody actions. [Citations.]" (*In re Dorothy I.* (1984) 162 Cal.App.3d 1154, 1158-1159.) Thus, to the extent that the trial court considered "character evidence," it was not prohibited from doing so.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.                    KIM (D.), J.

28